2018 IL App (1st) 141379-B

FIRST DIVISION
June 4, 2018

No. 1-14-1379

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 21347 |
| | ) | |
| SEBASTIAN RODRIGUEZ, | ) | Honorable |
| | ) | Michael J. Howlett, Jr. and |
| Defendant-Appellant. | ) | Neera L. Walsh, |
| | ) | Judges Presiding. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.
Justice Harris concurred in the judgment and opinion.
Justice Mikva concurred in part and dissented in part, with opinion.

## OPINION

¶ 1     This case is before us on remand from a supervisory order of our supreme court. Fifteen-year-old Sebastian Rodriguez was charged with first degree murder in connection with the shooting of thirteen-year-old Sameere Conn on October 1, 2008. At the time of the offense, 15-year-old defendants charged with first degree murder were automatically excluded from juvenile court jurisdiction. Sebastian was tried, convicted, and sentenced as an adult in criminal court. After a jury found Sebastian guilty of murder, the circuit court sentenced him to 50 years in prison: 25 years for the murder and 25 additional years pursuant to a then-mandatory firearm enhancement.

¶ 2    In this direct appeal, Sebastian argued that (1) the circuit court erroneously denied his motion to suppress evidence found during a search of his home, (2) expert testimony identifying a revolver found in his home as the murder weapon was improperly admitted without a hearing to determine if it was based on generally accepted scientific methodologies, and (3) a 50-year sentence for an offender who was 15 years old at the time of his offense was unconstitutional.

¶ 3    Shortly after Sebastian filed his notice of appeal, the Illinois legislature raised the age of automatic transfer from juvenile court to criminal court for defendants charged with first degree murder from 15 to 16 years of age (see Pub. Act 99-258, § 5 (eff. Jan. 1, 2016) (amending section 5-130(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/5-130(1)(a)))). The legislature also adopted additional sentencing guidelines for defendants who were under the age of 18 at the time of their offenses and who were tried as adults, including making firearm enhancements discretionary, rather than mandatory (see Pub. Act 99-69, § 10 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105); Pub. Act 99-258, § 15 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105)). In supplemental briefing, Sebastian argued that these amendments should apply to his case, pending on appeal.

¶ 4    In our initial opinion, issued on May 8, 2017, we agreed with Sebastian that the amendment increasing the minimum age for mandatory transfer to criminal court applied to cases, like his, that were pending on appeal when the amendment took effect. We affirmed the jury's guilty verdict for first degree murder, vacated Sebastian's sentence, and remanded this matter to the juvenile court for resentencing. The State sought review of that decision by the Illinois Supreme Court. Six months later, our supreme court decided, in *People v. Hunter*, 2017 IL 121306, ¶¶ 36, 43, that the amendment to the automatic transfer provision applied only to cases that were pending in the circuit court when the amendment took effect, but not to those

cases pending on appeal. Accordingly, on January 18, 2018, the supreme court issued a supervisory order in which it denied the State's petition for leave to appeal but directed us to vacate our earlier judgment and reconsider this case in light of *Hunter*. *People v. Rodriguez*, No. 122467 (Ill. Jan. 18, 2018) (supervisory order).

¶ 5    There is no question that the holding in *Hunter* applies in this case and that therefore our initial ruling that the amendment to the automatic transfer provision applies to Sebastian must be vacated. *Hunter* also holds that the amended sentencing guidelines apply only to sentencing hearings held after those amendments took effect. *Hunter*, 2017 IL 121306, ¶¶ 54-56. Although juvenile defendants who receive new sentencing hearings on remand must be sentenced in accordance with the amended guidelines, contrary to Sebastian's position, the new guidelines provide no independent basis for remand and resentencing.

¶ 6    There is no reason to revisit most of the issues raised in this appeal and decided in our initial opinion, as they are not impacted by *Hunter*. We will restate those aspects of our initial opinion here since our previous judgment is now vacated.

¶ 7    There are two issues that we did not previously reach that we must now decide and that have been fully briefed by the parties both in their original briefs and in supplemental briefs filed after our supreme court remanded this case for our reconsideration in light of *Hunter*. Those issues are whether defendant's 50-year sentence violates the eighth amendment and the proportionate penalties clause. We now hold, in accord with several other panels of this district, that defendant's 50-year sentence, pursuant to which he will not be eligible for release until the age of 65, is not a *de facto* life sentence and therefore consideration of the "distinctive attributes of youth" articulated by the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460, 471-72 (2012), and *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 733 (2016),

was not required. In addition, defendant's sentence does not violate the proportionate penalties clause. We therefore affirm the judgment and sentence on the charge of first degree murder.

¶ 8                                 I. BACKGROUND

¶ 9                              A. Pretrial Proceedings

¶ 10    Nine days after Sameere Conn's death, Chicago police obtained a warrant to search Sebastian Rodriguez's home for evidence related to the shooting. In the complaint for the search warrant, Detective Ricky Bean identified two eyewitnesses who testified before a grand jury that they knew Sebastian and saw him, dressed in a hooded sweatshirt, fire shots into the convenience store where Sameere was killed, as well as a third eyewitness who identified Sebastian as the individual he saw looking through the glass window of the store's door just before shots were fired through that window. According to the complaint, officers also learned from two other witnesses that Sebastian was known to possess a "kill list" of potential victims that included Sameere. Finally, the complaint alleged that, in connection with prior arrests, Sebastian had given the address 10744 South Hoxie Avenue in Chicago as his home address.

¶ 11    Finding this sufficient to establish probable cause, the circuit court issued a warrant to search Sebastian's home for "[o]ne dark colored or grey hooded sweat shirt, [o]ne document containing a list of individual names, [a]nd one handgun." Officers executed the warrant on October 11, 2008, retrieving a revolver from under a floorboard in the bathroom and a number of hooded sweatshirts from elsewhere in the home.

¶ 12    Sebastian was charged by grand jury indictment with first degree murder.

¶ 13    In his motion to suppress filed on April 26, 2010, Sebastian argued that the evidence recovered during the October 11, 2008, search should be excluded because, even if officers had probable cause to arrest him, they had no reason to believe that specific evidence would be found

in his home 10 days after the shooting.

¶ 14    Although an evidentiary hearing was held on Sebastian's motion to suppress, the testimony offered related only to the scope of the search and the manner in which it was conducted, issues that are not raised in this appeal. The circuit court denied Sebastian's motion, explaining that, in its view, when officers have "a strong identification of a suspected shooter and that person's home," then "it is not beyond logic, nor *** beyond the law, to have probable cause to see if in that person's place of residence, the place they call home, the place in which they keep their items, that there might be evidence of the crime there."

¶ 15    On May 9, 2013, Sebastian moved for an evidentiary hearing, pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), on the admissibility of expert testimony he expected the State to introduce linking the gun found in his home to a bullet recovered from the scene of the crime. Although he acknowledged that such testimony had historically been admitted by courts, he insisted a *Frye* hearing was needed because the reliability of the methodologies employed by ballistics experts had recently been questioned in the scientific community.

¶ 16    The circuit court disagreed and denied Sebastian's motion. Noting that it was aware of no published opinion of any court concluding that firearm identification evidence was not generally accepted in the scientific community, the court concluded that Sebastian's concerns went to the weight and not to the admissibility of the evidence.

¶ 17                                              B. Trial

¶ 18    A four-day trial in this case began on February 4, 2014. Because Sebastian does not contest the sufficiency of the evidence to support his conviction, we include only a brief summary of the trial testimony, with a fuller recitation of the firearms identification testimony, to provide context for the evidentiary issues raised on appeal.

¶ 19    At approximately 8 p.m. on October 1, 2008, Sameere walked home from nearby Trumball Park after a football game with a group of his friends from school. Sameere and two other boys stopped to purchase snacks at Hook's Finer Foods, a convenience store located at 106th Street and Bensley Avenue in Chicago, while two other friends waited outside. A handful of people were in the store at the time: the cashier, the owner of the building, and a few customers, including an individual known as "Tone" or "Tony," who was known to frequent the store. Sameere was near the front of the store waiting to make his purchase when, according to witnesses, he was shot multiple times through a window in the front door of the store.

¶ 20    Joseph Neal and John Rodgers testified that, on the evening of October 1, 2008, they were waiting across the street from Hook's Finer Foods for Sameere and the others when they saw Sebastian, who they knew from school and regularly saw around the neighborhood, approach the store. According to Joseph and John, Sebastian looked at them, put the hood of his sweatshirt up, and started firing a gun into the store. At trial, both boys insisted that Sebastian's sweatshirt was red—Joseph said "[i]t was red, same red as he always had"—and denied previously telling officers and a grand jury that it was blue and gray. Joseph also denied telling the grand jury that he and John were standing farther away from the store, near some offices. However, Joseph acknowledged that he initially told officers and a television reporter that he was inside the store and saw Sebastian tap on the glass before shooting. When asked why he lied, Joseph explained that he thought the better vantage point would make him more believable: "I knew who I seen and I really wanted [Sebastian] to get got for what he did, that's why I said all of that."

¶ 21    Anthony Ray (also known as "Tone" or "Tony"), who was in custody for failing to appear as a witness in this case, acknowledged his previous convictions for stealing a car and for

selling drugs and that he was a diagnosed schizophrenic who took medication for that condition. Anthony testified that he was at Hook's Finer Foods just before 8 p.m. on the evening of October 1, 2008, and saw a light-skinned person wearing "a black hoody" standing outside just before shots were fired through the front door of the store. Although Anthony at first told officers that he did not see the shooter, he identified a photo of Sebastian for police officers several days later, writing on the photo, "I saw him shoot through the window. Positive." However, at trial Anthony indicated that his identification was influenced by "two young kids" who were also in the store at the time of the shooting and were taken to the police station with him for questioning. Anthony explained: "I didn't personally, personally, like myself, describe that—the person that did the shooting ***. It's kind of like, kind of like I put two and two together. I seen a face and a hoody and everybody else saying they knew his name and they knew everything that happened."

¶ 22    The State called two friends of Sameere's, Kiante Lilly and Mario Martinez, to describe Sebastian's statements and conduct prior to the shooting. Kiante testified that, at Sameere's request, he set up a three-way telephone call in late September to try to resolve "a dispute" between Sameere and Sebastian. Although Kiante told the grand jury that, during that conversation, Sebastian said he had a "death list" and told Sameere "[y]ou on there, too, boy," at trial Kiante denied such a list was ever discussed, characterizing the call as nothing more than "a friendly conversation."

¶ 23    Mario testified that a month before the killing, in September 2008, defendant told him that he was going to kill Sameere. Mario also testified that Sebastian got out of a green truck and approached Mario on the evening of October 1, 2008, asked Mario if he wanted "to go take a ride," and showed him a gun—a revolver, "I don't really know, like a .38"—that Sebastian had wrapped in a sweater. Mario declined and went inside. Although Mario heard shots soon after, he

7

did not learn that Sameere had been killed until the next morning and did not tell officers about his encounter with Sebastian until they sought him out for an interview 10 days later.

¶ 24 The physical evidence in this case consisted of (1) a medium caliber lead bullet fragment recovered from Sameere's body; (2) a fired bullet recovered from a shelf inside Hook's Finer Foods on October 1, 2008; (3) a gunshot residue collection kit consisting of swabs of each of Sebastian's hands plus a control swab, which was administered by police officers shortly after midnight on October 2, 2008; (4) a blue steel .357 Dan Wesson revolver containing six .357-magnum caliber unfired cartridge cases, retrieved from under the floorboards of the bathroom during the October 11, 2008, search of the home at 10744 South Hoxie Avenue in Chicago; and (5) two gray and five black "hoody jackets" also recovered during that search.

¶ 25 Brian Mayland, a pattern evidence program manager for the Illinois State Police forensic sciences command, testified as an expert in the field of toolmark and firearm identification. Mayland previously worked for 17 years as a forensic scientist in firearms and toolmark identification and, for just over one year, as a laboratory director. Although his undergraduate degree was in business, Mayland testified that he had completed specialized training in the field of firearms identification, including a two-year training program conducted by the Illinois State Police, and had testified as an expert in the field approximately 80 times.

¶ 26 Mayland explained that a cartridge consists of four basic components: the case; the powder inside the case; the bullet, which is seated inside of the case; and the primer, a pressure-sensitive chemical compound located in the head of the case. When a gun is fired, the primer is struck, the resulting spark ignites the powder, gasses from the burning powder create pressure, and the pressure forces the bullet from the mouth of the cartridge down the barrel where rifling—raised and lowered areas known as "lands" and "grooves"—form a twisting pattern along the

inside of the barrel that causes the bullet to spin. Mayland testified that, as a firearm analyst, he uses a comparison microscope to examine two bullets or cartridge cases and compare the marks that are left behind on those items as a result of the firing process. Certain identifying features—like the caliber of the bullet, the number and width of the grooves in the rifling, and the direction of the twist—are known as "class characteristics"; they are present at the time of manufacture and common to an entire class of firearms. Other marks are created by imperfections that develop in a gun over time, as it is fired, and can be unique to a particular gun.

¶ 27    In this case, Mayland examined the fired bullet recovered from the scene of the crime and determined that it was a .38-caliber bullet jacket with six lands, six grooves, and a right-hand twist. He concluded that the metal fragment recovered from Sameere's body was too mutilated to be suitable for comparison. Mayland then test fired the revolver recovered from Sebastian's house, shooting four bullets into a tank of water, which slows the bullets without damaging them. He compared the test shots to each other to determine if he "could identify test shot with test shot," something he acknowledged is not always possible. In this case he determined that it was. He then compared the test shots side by side with the fired bullet under a comparison microscope. It was Mayland's opinion "that the fired bullet jacket was fired in that firearm."

¶ 28    Defense counsel objected to Mayland providing this conclusion without elaborating on the specific similarities or differences between the compared specimens that he relied upon as the basis for his opinion. The court sustained the objection, pending further inquiry. When asked to elaborat0e, Mayland stated that he "saw a sufficiently similar pattern of individual characteristics that allowed [him] to form an opinion." Specifically, "[t]here were striated marks that lined up when [he] was doing the comparison from the evidence bullet to the test fired bullet." Defense counsel again objected, but this time the circuit court overruled the objection.

¶ 29    On cross-examination, Mayland acknowledged that six is the most common number of lands and grooves and it is "very common" for a revolver to have six lands and grooves with a right-hand twist. Based on Mayland's experience, he believed that hundreds of guns in Chicago could have those same characteristics, noting, however, that he could not be more specific because gun manufacturers "are very close" with such information.

¶ 30    Mayland also noted that the bullet jacket he analyzed was "badly mutilated," consistent with it having struck something. "Based on the condition of the bullet jacket," he said he measured at least two and "probably three" lands and grooves, although he did not know that for certain and did not document his measurements in his notes. Mayland acknowledged that none of the test shots matched the fired bullet casing exactly. However, he also stated that "no two test shots will ever look exactly the same." Mayland insisted that, in this case, "there was a sufficiently similar pattern" between the test shots and the fired bullet case for him to form his opinion. Mayland agreed both that there is no nationally recognized standard to determine that the patterns were close enough to have been generated by the same gun and that his opinion was a subjective one, not capable of verification by objective testing.

¶ 31    On redirect examination, Mayland reiterated that he has compared tens of thousands of bullets and cartridge cases over his career, that he followed all Illinois State Police lab protocols, and that he used methods commonly accepted in the field of firearms identification. Mayland confirmed that nothing he was asked during cross-examination affected his opinion that the bullet he analyzed was fired from the revolver found in Sebastian's home.

¶ 32    Mary Wong, a forensic scientist with the Illinois State Police forensic sciences division, testified as an expert in the field of gunshot residue analysis. Wong tested the swabs from the residue collection kit administered to Sebastian at 12:30 a.m. on October 2, 2008, and the hooded

sweatshirts retrieved from his home. None of the items tested positive for gunshot residue. Although Wong found two "tricomponent particles" on the sample taken from Sebastian's left hand and one on the sample taken from his right hand, she explained that at least three particles from the same sample are required to make a positive identification. All Wong could conclude from her analysis was that Sebastian "may not have discharged the firearm with either hand" and, "if he did, then the particles were either removed by activity or not deposited or not detected by the procedure." Although tricomponent particles are found in fireworks and car airbags in addition to gunshot residue, Wong stated that other particles one would expect to find following contact with those items were not present in the samples she tested. However, she acknowledged that gunshot residue particles may be transferred to a person who touches a surface in a room where a gun was fired or who comes in contact with someone who recently fired a gun.

¶ 33    Sebastian did not testify but presented the testimony of several witnesses.

¶ 34    Rosa Silva, an investigator with the public defender's office, testified that, in 2013, Joseph Neal told her that on the night of October 1, 2008, he saw a person with a red hoody sweatshirt but that it was dark and he could see only the skin on the left side of the person's jaw. Joseph told Silva he thought the person was Sebastian because of the hooded sweatshirt.

¶ 35    Sebastian's father, Steven Rodriguez Sr. testified that in October 2008 he owned a green Dodge Dakota and lived at 10744 South Hoxie Avenue in Chicago with his five sons. Steven's two oldest sons, Steven Jr. and David, who were, respectively, 21 and 20 years old, were members of the Latin Counts gang and had their friends over to the house "[a]ll the time."

¶ 36    Steven Rodriguez Jr. testified that Sebastian came home alone after school on October 1, 2008, and remained in his room until police officers arrived around 8:15 p.m. On cross-examination, Steven acknowledged that he was in the front of the house watching TV and

11

playing video games and was not looking at the back door. Steven did not ever tell the police that Sebastian had been at home with him because he did not think they would believe him.

¶ 37 Frank Maizer testified that he owned the building where Hook's Finer Foods is located and was in the store on the night of October 1, 2008. According to Maizer, the store had four surveillance cameras but they were not recording that day because the memory was full. He denied telling officers that he had inadvertently erased the videos but agreed that he might have told them that Anthony Ray removed an object from his mouth before the police arrived.

¶ 38 In its closing argument, the State urged the jury to believe the eyewitness testimony identifying Sebastian as the shooter, which was corroborated by the particles of gunshot residue found on Sebastian's hands and Mayland's testimony that the gun found in Sebastian's home was the murder weapon. Defense counsel responded by pointing out that there were innocent explanations for a few particles of gunshot residue to be on a person's hands and attacked Mayland's conclusions as not being based on objective standards or specific measurements. Defense counsel argued that, following the shooting, Sameere's friends heard a rumor that Sebastian killed Sameere and were willing to lie about what they saw to make sure he was convicted. According to defense counsel, it was more likely that some unidentified shooter intending to shoot Anthony Ray, a former gang member who was carrying drugs at the time, had inadvertently shot Sameere.

¶ 39 The jury found Sebastian guilty of first degree murder and the circuit court denied his motion requesting a new trial, in which he argued that the circuit court erred when it denied both his motion to suppress and his motion for a *Frye* hearing. Following a hearing, the court sentenced Sebastian to 25 years in prison for first degree murder (730 ILCS 5/5-4.5-20(a) (West 2014)), plus a mandatory sentencing enhancement of 25 additional years for personally

discharging the firearm that caused Sameere's death (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014)), and 3 years of mandatory supervised release (730 ILCS 5/5-8-1(d)(1) (West 2014)). The court denied Sebastian's motion to reconsider his sentence, and Sebastian appealed.

¶ 40                                    II. JURISDICTION

¶ 41    Sebastian was sentenced by the circuit court on March 31, 2014, and timely filed his notice of appeal on April 15, 2014. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case (Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013)). As noted above, the case is before us on a remand from our supreme court. *People v. Rodriguez*, No. 122467 (Ill. Jan. 18, 2018) (supervisory order).

¶ 42                                    III. ANALYSIS

¶ 43    On appeal, Sebastian argues that his conviction for first degree murder should be reversed both because the circuit court erroneously denied his motion to suppress the evidence resulting from the search of his residence for a lack of probable cause and because the circuit court should have conducted a *Frye* hearing before admitting the testimony of the State's expert on toolmark and firearms identification.

¶ 44    Sebastian also argues that his 50-year sentence is unconstitutional. Prior to our supreme court's decision in *Hunter*, Sebastian also argued that an amendment to the exclusive jurisdiction statute changing the age from 15 to 16 for the automatic transfer to criminal court of cases involving certain crimes should be applied retroactively to his case. Pursuant to that amendment, Sebastian asked us to vacate his sentence and remand this matter to juvenile court, where the State could seek a discretionary transfer hearing if it chose. Sebastian alternatively argued that he was entitled to a new sentencing hearing conducted pursuant to amended sentencing guidelines

for individuals who were under the age of 18 at the time of their offenses.

¶ 45   We address each argument in turn.

¶ 46                             A. Motion to Suppress

¶ 47   Sebastian initially argues that the circuit court should have granted his motion to suppress because the police lacked sufficient probable cause to search his home. Sebastian does not argue that the police lacked probable cause to arrest him for Sameere's murder but that having this did not necessarily mean they also had probable cause to search his home for specific evidence. According to Sebastian, the complaint submitted by Detective Bean in support of the search warrant was defective because it failed to establish a sufficient nexus between Sameere's shooting and the items sought from Sebastian's home 10 days later, *i.e.*, the murder weapon, a hooded sweatshirt worn during the shooting, and a suspected list of potential victims. The State argues that, under the circumstances of this case, it was reasonable for the circuit court to infer that such items might be found in Sebastian's home.

¶ 48   Both the United States Constitution and the Illinois Constitution require that a warrant to search an individual's home must be based on probable cause and supported by an affidavit describing the place to be searched and the items to be seized. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Probable cause exists "if facts set forth in an affidavit would cause a reasonable person to believe a crime has been committed and evidence of that crime is in the place to be searched." *People v. Damian*, 299 Ill. App. 3d 489, 491 (1998). A nexus must be established— directly or through reasonable inferences—between the criminal offense, the items to be seized, and the place to be searched. *People v. Beck*, 306 Ill. App. 3d 172, 178-79 (1999). The issuing court's task "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit ***, there is a fair probability that contraband or evidence

of a crime will be found in a particular place." (Internal quotation marks omitted.) *People v. McCarty*, 223 Ill. 2d 109, 153 (2006). Although we review a circuit court's ruling on a motion to suppress *de novo* (*People v. Pitman*, 211 Ill. 2d 502, 512 (2004)), we defer to an issuing judge's determination of probable cause and resolve any doubts in favor of upholding a warrant that has been issued (*People v. Exline*, 98 Ill. 2d 150, 156 (1983) (citing *United States v. Ventresca*, 380 U.S. 102 (1965))).

¶ 49    We are satisfied that Detective Bean's complaint established probable cause to search Sebastian's home. The police sought not only the murder weapon and a list of intended victims but a specific article of clothing—a dark-colored or gray hooded sweatshirt—identified by three eyewitnesses as something Sebastian was wearing at the time of the shooting. Although we certainly agree that probable cause to arrest does not always equate to probable cause to search the arrestee's home, it is reasonable to infer, absent evidence to the contrary, that a person will generally keep possessions, including possessions that link that person to the crime, in his or her home. See, *e.g.*, *People v. Hammers*, 35 Ill. App. 3d 498, 504 (1976) ("The complaint was sufficient to show probable cause that [the] defendant shot and killed the victim, and, if so, it was reasonable for the issuing judge to infer that the weapon used might be at the defendant's home nine days later."); *People v. Weinger*, 63 Ill. App. 3d 171, 175 (1978) (concluding that it was a "logical supposition" for the defendant to have clothing and jewelry purportedly worn by him during the murders he was charged with, as well as the murder weapon, in his apartment). Here, it was entirely reasonable to infer that Sebastian, a 15-year-old boy with no vehicle or other place to store such items, would keep a gun, clothing, and a list of potential targets at his residence.

¶ 50    In the cases relied on by Sebastian, circumstances were present that undermined the common, justified assumption that possessions are generally kept in the home. For example,

Sebastian relies on *People v. McCoy*, 135 Ill. App. 3d 1059 (1985), but the defendant in *McCoy*, who was charged with possessing a firearm without a firearm owner's identification card, was an adult who was recently seen by a coworker with several guns in his van. *Id.* at 1062. Under these circumstances, where the defendant had other places available to him to keep the guns at issue— *i.e.*, at his place of employment or in his van—more was needed to say that a fair probability existed that the guns would be found in the defendant's home. *Id.* at 1066.

¶ 51   *People v. Rojas*, 2013 IL App (1st) 113780, is similarly distinguishable. There, the only evidence supporting a warrant to search the defendant's residence consisted of cryptic telephone conversations that, although they might have suggested "that the criminal activity of drug trafficking was afoot," did not indicate where the drug trafficking was occurring. *Rojas*, 2013 IL App (1st) 113780, ¶ 18. To the contrary, the conversations suggested that the other party did not know where the defendant's house was located and had not been there before. *Id.* Under those circumstances, the court in *Rojas* concluded that the officers' "generic offering that drug trafficking records 'are often maintained under dominion and control of the narcotics traffickers, and as such, are often kept in their residences or other secure locations' " did not rise above the level of conjecture. *Id.* Like the defendant in *McCoy*, who had other places available to him to store the firearms he was alleged to illegally possess, the defendant in *Rojas* could have stored such records in other locations. The absence of any evidence indicating that Sebastian, a teenager living in his father's home, had other places available to him to store his possessions distinguishes the facts of this case from those present in both *McCoy* and *Rojas*.

¶ 52   Because we conclude that probable cause existed to search Sebastian's home, we need not reach the State's alternative arguments that the good faith exception to the exclusionary rule applies or that the admission of evidence resulting from the search was harmless error.

¶ 53                                    B. Motion for a *Frye* Hearing

¶ 54    Sebastian also argues that the circuit court erred in denying his motion to either exclude the State's toolmark and firearm identification evidence or to hold a *Frye* hearing to determine the admissibility of that evidence. In support of his contention, both in the circuit court and on appeal, that such evidence is not generally accepted in the scientific community, Sebastian relies primarily on a 2009 report authored by the National Research Council of the National Academy of Sciences (NRC) titled "Strengthening Forensic Science in the United States: A Path Forward."[1] In that report, the NRC noted that toolmark identification has "never been exposed to stringent scientific scrutiny,"[2] involves "subjective qualitative judgments by examiners,"[3] is "based on unarticulated standards,"[4] and lacks any "statistical foundation for estimation of error rates."[5] The NRC concluded that, although there is some benefit to be derived from this testimony, additional studies are needed to address these concerns.

¶ 55    The circuit court denied Sebastian's motion for a *Frye* hearing, concluding that the criticisms raised in the NRC's report go to the weight, and not the admissibility, of toolmark and firearm identification evidence. The court also noted that there are no published opinions holding that such evidence is not generally accepted in the relevant scientific community.

¶ 56    In Illinois, "new" or "novel" scientific evidence is only admissible if it meets the standard set out in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *People v. McKown*, 226 Ill. 2d 245, 254, 257 (2007). "[T]he methodology or scientific principle upon which the opinion is based [must be] sufficiently established to have gained general acceptance in the particular field

---

[1]National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward (2009), https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf.
    [2] *Id.* at 42.
    [3] *Id.* at 153.
    [4] *Id.* at 153-54.
    [5] *Id.* at 154.

in which it belongs." (Internal quotation marks omitted.) *Id.* at 254. A court may determine whether a methodology or principle is generally accepted either by conducting an evidentiary hearing or "by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject." *Id.* A scientific methodology need not be universally accepted or even accepted by a majority of experts in the field; "[i]nstead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field." *In re Commitment of Simons*, 213 Ill. 2d 523, 530 (2004). Although it is within the circuit court's discretion to decide both whether a particular witness is qualified to testify as an expert in a particular field and whether the testimony that witness will offer is relevant, we review *de novo* the circuit court's determination of whether the methodology used by the witness meets *Frye*'s "general acceptance" standard. *People v. Nelson*, 235 Ill. 2d 386, 430-31 (2009).

¶ 57    We first consider whether toolmark and firearm identification evidence is "new" or "novel." The State contends that it is decidedly not, noting that courts have allowed such evidence since at least 1930, when our supreme court held in *People v. Fisher*, 340 Ill. 216, 240-41 (1930) that, while a jury is not bound to accept it as true, firearm identification evidence "is competent expert testimony on a subject properly one for expert knowledge." In the decades since *Fisher*, firearms experts have regularly testified in Illinois courts, for both the prosecution and the defense.

¶ 58    Sebastian does not dispute this, but insists that, pursuant to our supreme court's analysis in *McKown*, firearm identification evidence is nevertheless novel because "there is no record that there has ever been a *Frye* hearing in Illinois to determine whether generally accepted scientific principles support [it]." The court in *McKown* held that the horizontal gaze nystagmus (HGN)

18

test, a field sobriety test frequently used by police officers, was a novel methodology subject to the *Frye* standard. *McKown*, 226 Ill. 2d at 258. The court explained that its holding was based on "the history of legal challenges to the admissibility of HGN test evidence, and the fact that a *Frye* hearing ha[d] never been held in Illinois." *Id.* However, as the court noted, the HGN test was "repeatedly challenged in court, with varying degrees of success," both in Illinois and in other states, and this court had issued "divergent opinions on the topic," such that the general acceptance of the test "remain[ed] unsettled." (Internal quotation marks omitted.) *Id.* at 257.

¶ 59    This case is distinguishable from *McKown* because the admissibility of firearms identification evidence is not similarly "unsettled" in Illinois. The circuit court noted that it was unaware of any published opinion of any court stating that firearms evidence was not generally accepted in the scientific community, and Sebastian has cited none on appeal. The few out-of-state cases Sebastian cites—in which courts have raised concerns about the reliability of such evidence but have nonetheless held the methodology to be sufficiently reliable to be admitted, at least in some qualified form—do not create the same situation the *McKown* court was presented with, where legal challenges were resolved both for and against admissibility of the HGN test and the law was truly unsettled. See *United States v. Glynn*, 578 F. Supp. 2d 567, 569-75 (S.D.N.Y. 2008); *United States v. Monteiro*, 407 F. Supp. 2d 351, 355 (D. Mass. 2006); *United States v. Green*, 405 F. Supp. 2d 104, 120-24 (D. Mass. 2005).

¶ 60    Similarly unhelpful are cases involving testimony based on scientific methodologies that, although sometimes deemed admissible, never achieved the same sort of widespread acceptance as ballistics evidence. See *People v. Zayas*, 131 Ill. 2d 284, 296 (1989) (hypnotically refreshed testimony); *People v. Baynes*, 88 Ill. 2d 225, 244 (1982) (polygraph tests).

¶ 61    Although we understand the concerns raised by other courts and by the NCR in its report

regarding the subjectivity of firearm identification testimony and the inability to test its accuracy, we cannot say that the circuit court erred in denying Sebastian's motion for a *Frye* hearing. Toolmark and firearm identification evidence is not new or novel, either pursuant to the plain meaning of those words or in accordance with the analysis employed by our supreme court in *McKown*. Far from being unsettled, the law in Illinois is consistent in its admission of such evidence. See *People v. Robinson*, 2013 IL App (1st) 102476, ¶ 80.

¶ 62    Nor do we find that the NCR's report so undermines the reliability of ballistics evidence that it has ceased to be "generally accepted" in the scientific community. We agree with the circuit court that the report's concerns go to the weight and not to the admissibility of such evidence. Indeed, our review of the record in this case indicates that—in connection with his objection that some of Mayland's testimony lacked foundation, the denial of which Sebastian chose not to contest on appeal—during cross-examination defense counsel explored at length the limitations of Mayland's conclusions.

¶ 63    C. Retroactivity of Amendment Changing the Minimum Age for Automatic Transfer

¶ 64    Shortly after Sebastian filed his notice of appeal, Public Act 99-258 was enacted (Pub. Act 99-258 (eff. Jan. 1, 2016)). Among other things, it amended section 5-130 of the Juvenile Court Act to raise the age of automatic transfer from juvenile court to criminal court for individuals charged with first degree murder from 15 to 16 years of age. 705 ILCS 405/5-130(1)(a) (West 2016). In the first round of supplemental briefing, Sebastian argued that this amendment should apply to him retroactively. We agreed. Relying on our supreme court's decision in *People ex rel. Alvarez v. Howard*, 2016 IL 120729, ¶ 28, which held that this amendment to the Juvenile Court Act regarding the age for automatic transfer applied retroactively to pending cases, we vacated Sebastian's sentence and remanded his case to the

juvenile court where the State could seek a discretionary transfer to criminal court if it so chose.

¶ 65    In *Howard* our supreme court reasoned that, because the legislature did not clearly indicate the temporal reach of the amendment to section 5-130, the general savings clause in section 4 of the Statute on Statutes applied. *Howard*, 2016 IL 120729, ¶¶ 20, 28 (citing 5 ILCS 70/4 (West 2014)). That savings clause has been interpreted to mean that procedural changes to statutes should be applied retroactively and substantive changes applied prospectively. *Id.* ¶ 20. Because a transfer from juvenile court to criminal court is a matter of procedure, the *Howard* court held that the amendment applied to all "pending cases." *Id.* ¶ 28.

¶ 66    Although *Howard* involved a case pending in the circuit court, in our initial opinion we concluded that its retroactivity analysis applied equally to cases, like Sebastian's, that were pending on direct appeal when the amendment took effect. However, in *Hunter*, 2017 IL 121306, ¶ 43, our supreme court reached the opposite conclusion. Acknowledging that its "retroactivity jurisprudence ha[d] not typically distinguished" between cases pending in the circuit court and cases pending on direct review, the court addressed why such a distinction was proper under the circumstances. *Id.* ¶¶ 27-28. As the court explained, in *Hunter*, unlike in *Howard*, there were no " 'ongoing proceedings' " in the circuit court that the new statute could be applied to and there was no reversible error necessitating such proceedings. *Id.* ¶ 32. The court also noted that, under section 4 of the Statute on Statutes, procedural amendments are applied retroactively only " 'so far as practicable.' " *Id.* ¶ 37 (quoting 5 ILCS 70/4 (West 2016)). In *Howard* the court had equated "practicable" with "feasible." *Id.* ¶ 38 (citing *Howard*, 2016 IL 120729, ¶ 32). The *Hunter* court, however, rejected the notion that remand to the juvenile court for a discretionary transfer hearing was practicable for the defendant in *Hunter*, who, unlike the defendant in *Howard*, had aged out of juvenile court jurisdiction. *Id.* (citing *People v. Fiveash*, 2015 IL

21

117669, ¶¶ 14-16 (holding the scope of the Juvenile Court Act is limited to persons under the age of 21)); *id.* ¶ 41.

¶ 67    There is no basis on which to distinguish Sebastian's case from *Hunter*. As in that case, there are no ongoing circuit court proceedings and, due to his age, Sebastian is no longer subject to the jurisdiction of the juvenile court. The amendment to the automatic transfer provision of the Juvenile Court Act that took effect while Sebastian's case was on direct appeal does not apply.

¶ 68    In *Hunter* our supreme court also held that the amended sentencing guidelines for juvenile defendants sentenced in criminal court (see 730 ILCS 5/5-4.5-105 (West 2016)) apply only to sentencing hearings held after those amendments took effect. *Hunter*, 2017 IL 121306, ¶¶ 54-56. Juvenile defendants who receive new sentencing hearings on remand must be sentenced in accordance with the new guidelines, but pursuant to *Hunter*, we must reject Sebastian's argument that the amended guidelines provide an independent basis for us to remand his case for resentencing.

¶ 69                                    D. Constitutionality of Sentence

¶ 70    We now consider the issue we did not reach in our previous opinion: whether Sebastian's 50-year sentence, pursuant to which he will not be released until the age of 65, is a *de facto* life sentence subject to our supreme court's holding in *People v. Reyes*, 2016 IL 119271 (*per curiam*), and whether this sentence violates both the eighth amendment (U.S. Const., amend. VIII) and the proportionate penalties clause (Ill. Const. 1970, art. I, § 11). After considering the parties' supplemental briefing on this issue and the relevant controlling and persuasive authorities, we conclude that defendant's 50-year sentence is not a *de facto* life sentence and does not violate the eighth amendment or the proportionate penalties clause.

¶ 71    Defendant, who was 15 years old at the time he committed the murder in this case, was

sentenced to 50 years' imprisonment for his conviction of first degree murder. The statutory minimum for the first degree murder in this case was 45 years: 20 years for the murder and 25 years for the firearm enhancement. (See 730 ILCS 5/5-4.5-20(a) (West 2016) (providing a range of 20 to 60 years); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016) (providing for an add-on of 25 years to natural life).) Defendant asserts that he will have to serve 100% of the 50-year sentence and will not be released until he reaches the age of 65.

¶ 72    Recently in *Reyes*, 2016 IL 119271, our supreme court held that a *de facto* life sentence imposed on a juvenile constitutes cruel and unusual punishment in violation of the eighth amendment if the sentence is imposed without considering the mitigating factors set forth in *Miller*, 567 U.S. 460. The court did not specifically address what length of sentence constitutes a *de facto* life sentence, but the State conceded that the defendant would not live long enough to become eligible for release (the defendant would be eligible for release after serving 89 years). *Reyes*, 2016 IL 119271, ¶ 10. The court found:

> "A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *Id*. ¶ 9.

¶ 73    Our supreme court has yet to provide guidance on what length of sentence constitutes a *de facto* life sentence. However, defendant's 50-year sentence is significantly less than prison terms found to be unconstitutional under *Miller*. See *Reyes*, 2016 IL 119271, ¶ 10 (aggregate sentence of 97 years); *People v. Nieto*, 2016 IL App (1st) 121604, ¶ 43 (78-year sentence). The

length of defendant's prison sentence is substantially similar to cases in which we have found that the sentence imposed on a juvenile did not amount to a *de facto* life sentence. See *People v. Applewhite*, 2016 IL App (1st) 142330 (45-year sentence, allowing release at age 62); *People v. Gipson*, 2015 IL App (1st) 122451 (52-year sentence); *People v. Hoy*, 2017 IL App (1st) 142596 (upholding 52-year sentence); *cf. People v. Buffer*, 2017 IL App (1st) 142931; *People v. Joiner*, 2018 IL App (1st) 150343. Although defendant's age upon release, 65, would fall toward the end of his actuarial lifespan, his sentence is objectively survivable and thus cannot be considered the functional equivalent of a *de facto* life sentence.

¶ 74    In so holding, we affirm our earlier position that the determination as to whether a particular sentence amounts to a *de facto* life sentence should not be based on actuarial data specific to the defendant, including race, ethnicity, gender, and other social factors bearing on an individual's life expectancy. *People v. Perez*, 2018 IL App (1st) 153629, ¶ 37. As this panel held in *Perez*, "[a]ppellate courts will be treading into dangerous territory if they start reviewing sentencing reductions through the prism of race, ethnicity, or gender." *Id.* Absent further guidance from our supreme court on what specific factors, other than the length of sentence, if any, a court of review should consider in determining whether a particular length of sentence for a juvenile offender should be considered a *de facto* life sentence, we will apply the rationale of *Miller* and *Reyes.*

¶ 75    Even if the sentence imposed here could be considered a *de facto* life sentence, it is clear from the record that the trial court considered defendant's youth and attendant circumstances at sentencing. When defense counsel began to address the *Miller* factors in mitigation, the trial judge made clear that she would not be sentencing defendant to natural life, which would have required her to consider the *Miller* factors (*Reyes* had not yet been decided). The record is clear

that the trial court nevertheless considered the *Miller* factors in its sentencing decision.

¶ 76    The inquiry into whether a sentencing court complied with *Miller* is backwards-looking. *People v. Holman*, 2017 IL 120655, ¶ 47. In this case, the court stated, "I am mindful [that defendant] was 15 years old at the time." The court further stated "I am to consider his rehabilitative potential" and the facts surrounding the incident as well as defendant's lack of criminal history. The court considered the age of the victim and the facts surrounding the offense. The court clearly considered defendant's presentence investigation, which detailed defendant's youth, educational and social history. The court heard arguments in aggravation and mitigation, and deliberately chose to impose a 50-year sentence, which is five years more than the required minimum sentence. The trial court intentionally decided to give defendant a sentence less than the maximum and refused to give defendant a life sentence. The fact that defendant considers his 50-year sentence for murdering a 13-year-old excessive does not alter the fact that defendant received a sentencing hearing that complied with *Miller* and also considered the seriousness of the offense, defendant's rehabilitative potential, and the need to protect society.

¶ 77    Defendant also argues his 50-year sentence is unconstitutional under the proportionate penalties clause of the Illinois Constitution both facially and as-applied to him. Defendant claims that "the proportionate penalties clause cannot abide the statutory mandate that all 15-year-olds convicted of first degree murder with a firearm serve a minimum adult sentence of 45 years."

¶ 78    A challenge under the proportionate penalties clause "contends that the penalty in question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). A violation of the proportionate penalties clause may be shown where the penalty imposed is " 'cruel, degrading, or so wholly disproportionate to the offense

committed as to shock the moral sense of the community.' " *Id.* (quoting *People v. Moss*, 206 Ill. 2d 503, 522 (2003)). However, our supreme court has "never defined what kind of punishment constitutes 'cruel,' 'degrading,' or 'so wholly disproportioned to the offense as to shock the moral sense of the community' " because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *People v. Miller*, 202 Ill. 2d 328, 339 (2002) (*Leon Miller*). "To determine whether a penalty shocks the moral sense of the community, we must consider objective evidence as well as the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 79    At the forefront, defendant asserts that the proportionate penalties clause provides greater protection than the eighth amendment. The State responds that the Illinois proportionate penalties clause is coextensive with the cruel and unusual punishment clause and, because his eighth amendment challenge failed, defendant's proportionate penalties argument must also fail. We acknowledge that the proportionate penalties clause has been found to offer greater protection to defendants than the eighth amendment. See *People v. Thomas*, 2017 IL 142557, ¶ 23; *People v. Clemons*, 2012 IL 107821, ¶ 40; *People v. Wilson*, 2016 IL App (1st) 141500, ¶ 38; *People v. Pace*, 2015 IL App (1st) 110415, ¶ 139.

¶ 80    Our legislature enacted the firearm enhancement statute requiring the imposition of additional prison time for the use of a firearm during the commission of certain crimes (730 ILCS 5/5-8-1(a)(1)(d)(i)-(iii) (West 2000)) with the purpose of promoting "public health and safety, and to impose severe penalties that will deter the use of firearms in the commission of felonies." *People v. Butler*, 2013 IL App (1st) 120923, ¶ 36. Our supreme court has consistently upheld the constitutionality of mandatory firearm enhancements under the proportionate penalties clause, finding that in fixing a penalty for an offense, the potential for rehabilitation

need not be given greater weight or consideration than the seriousness of the offense. *Sharpe*, 216 Ill. 2d at 525. We are aware that our legislature recently enacted a new statute that allows a trial court discretion in imposing these firearm enhancements on juveniles (730 ILCS 5/5-4.5-105(b) (West 2016)), but the legislature did not completely eliminate the application of the firearm enhancement, nor did it make the provision retroactive. *Hunter*, 2017 IL 121306, ¶ 56. This demonstrates that the legislature intended the application of the firearm enhancements to be appropriate in certain circumstances involving juveniles.

¶ 81    The evidence in this case proved that defendant declared his intention to kill 13-year-old Sameere Conn one month before he approached a convenience store, put the hood of his sweatshirt up, and fired a gun into the store killing Sameere, who had stopped at the store to buy snacks after a football game. The evidence further showed that Sameere was on defendant's "death list." This was a cold act of premeditated murder. However, we must consider more than defendant's conduct when analyzing a sentence under the proportionate penalties clause. *Gipson*, 2015 IL App (1st) 122451, ¶ 72.

¶ 82    Defendant argues that his culpability is diminished because he was negatively influenced by others. Defendant claims that he grew up with two older brothers who belonged to the Latin Kings street gang. He also claims that his house was strewn with filth and garbage throughout. No school books or desks were present in the home. Defendant argues that the negative influences in his life and his upbringing, over which he had no control, are similar to those of the defendants in *Gipson*, 2015 IL App (1st) 122451, and *Leon Miller*, 202 Ill. 2d 328, whose sentences were found to be in violation of the proportionate penalties clause.

¶ 83    Despite defendant's contention to the contrary, we find *Gipson* and *Leon Miller* to be factually distinguishable. In *Gipson*, the record contained evidence that the juvenile defendant

had mental illness that made him prone to impulsive behavior. *Gipson*, 2015 IL App (1st) 122451, ¶ 3. Gipson's own counsel described defendant as a " 'disturbed retarded child' under his older brother's spell." *Id*. ¶ 17. The defendant had previously been found unfit to stand trial in a prior proceeding, and the trial court acknowledged that the state system failed defendant by not providing mental health treatment. *Id*. ¶ 74. There is nothing in the record before us to indicate that defendant suffered from a similar severe mental illness or was denied necessary mental health treatment.

¶ 84    In *Leon Miller*, the juvenile was tried as an adult and convicted of two counts of first degree murder on an accountability theory. *Leon Miller*, 202 Ill. 2d at 330. The evidence at trial showed that two men approached the defendant while he was standing on a street corner and asked him to act as a lookout for them. *Id*. at 330-31. The defendant agreed and acted as a lookout while the two men shot two other men. *Id*. The defendant was sentenced to 50 years' imprisonment. *Id*. at 332.

¶ 85    Our supreme court held the multiple-murder sentencing statute, which mandated a sentence of natural life imprisonment, was unconstitutional as applied to the defendant, who was convicted under a theory of accountability. *Id*. at 341. The court reasoned that the convergence of the transfer statute, the accountability statute, and the multiple-murder sentencing statute in the defendant's case eliminated the court's discretion to consider mitigating factors like the defendant's age and degree of participation. *Id*. at 342. The fact that defendant had only been informed of the murders minutes before it happened and that he was convicted on a theory of accountability renders any factual comparison between defendant's case and *Leon Miller* inappropriate.

¶ 86    In the case at bar, defendant had a "kill list" and Sameere was on it. Defendant stated his

intention to kill Sameere one month before he intentionally shot and killed him. Defendant later went to a store where Sameere was buying snacks and shot Sameere, killing him. In our view, there is nothing about the proffered negative influences in defendant's life or his upbringing that would render his sentence unconstitutional under the proportionate penalties clause. Defendant's argument on appeal relating to his diminished culpability and the negative influences on his life were made to and considered by the trial court. We have no doubt that the penalty imposed was determined after thoughtful consideration of the seriousness of the offense, defendant's youth, and his rehabilitative potential. *Sharpe*, 216 Ill. 2d at 487.

¶ 87    As we have found that defendant's sentence did not violate the proportionate penalties clause as applied to him, we need not address his facial challenge. Where a statute or ordinance is constitutional as applied to a party, a facial challenge will also fail since there is necessarily at least one circumstance in which the statute or ordinance is constitutional. *Horvath v. White*, 358 Ill. App. 3d 844, 854 (2005); see also *Freed v. Ryan*, 301 Ill. App. 3d 952, 958 (1998).

¶ 88                                    IV. CONCLUSION

¶ 89    We hold that the court did not err in denying defendant's motion to suppress. A *Frye* hearing was not necessary before admitting the testimony of the State's expert witness. Under *Hunter*, defendant is not entitled to a new transfer hearing. Defendant's 50-year sentence for first degree murder is not a *de facto* life sentence and does not violate the eighth amendment or the proportionate penalties clause. For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 90    Affirmed.

¶ 91    JUSTICE MIKVA, concurring in part and dissenting in part:

¶ 92    I dissent from the majority's holding that Sebastian's 50-year sentence, pursuant to which

29

he will be kept in prison until the age of 65, is not a *de facto* life sentence. I also disagree with the majority's conclusion that we can determine from the record in this case that the circuit court judge considered the factors set out in *Miller*, 567 U.S. 460 (2012).

¶ 93    A growing body of jurisprudence and legislative action firmly establishes that juvenile offenders differ in significant ways from adult offenders. Juveniles lack maturity, are more likely to take risks, are more susceptible to negative influences, have only limited control over their environments, and are frequently unable to remove themselves from settings where crime is likely to occur. *Id.* at 471. Their character traits are less well-formed than those of adults, and their conduct is less indicative of their capacity for change. *Id.* The Court has recognized that the "diminished culpability and greater prospects for reform" of juveniles correspond with diminished penological justifications for imposing on them the harshest sentences available. (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at __, 136 S. Ct. at 733. Following its earlier cases holding that sentencing juveniles to death for any crime or to life in prison without parole for crimes other than murder violated the eighth amendment to the United States Constitution (*Roper v. Simmons*, 543 U.S. 551, 578-79 (2005); *Graham v. Florida*, 560 U.S. 48, 82 (2010)), the Court held in *Miller* that the eighth amendment also "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. Embracing the *Miller* factors even more broadly, our legislature recently determined that, effective January 1, 2016, the *Miller* factors must be considered before *any* sentence is imposed on a juvenile offender. 730 ILCS 5/5-4.5-105(a) (West 2016). It also made firearm enhancements discretionary, rather than mandatory, for juveniles. *Id.* § 5-4.5-105(b)-(c).

¶ 94    Two recent decisions of our supreme court offer guidance on how *Miller* should be retroactively applied to those juveniles sentenced before the legislative changes noted above took

30

effect. In *Holman*, 2017 IL 120655, ¶ 40, the court held that *Miller* applies to discretionary as well as to mandatory sentences of life in prison without parole for juveniles. And in *Reyes*, 2016 IL 119271, ¶¶ 9-10, the court joined a number of other state courts that have recognized that the concerns present in *Miller* are triggered not only when a juvenile has received a *de jure* life sentence, but when a lengthy term-of-years sentence is a *de facto* life sentence, *i.e.*, the functional equivalent of a sentence of life in prison without parole. See *State v. Ramos*, 387 P.3d 650, 658 (Wash. 2017); *State v. Zuber*, 152 A.3d 197, 211-12 (N.J. 2017); *People v. Franklin*, 370 P.3d 1053, 1059-60 (Cal. 2016); *Casiano v. Commissioner of Correction*, 115 A.3d 1031, 1047-48 (Conn. 2015); *Bear Cloud v. State*, 2014 WY 113, ¶ 37, 334 P.3d 132 (Wyo. 2014); *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014); *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013).

¶ 95    As is often the case when a high court establishes a new rule, later cases clarify its contours. *Reyes* provides only a broad outline. In that case the State conceded, and our supreme court agreed, that the defendant's 97-year sentence—of which he would be required to serve at least 89 years and which would make him at least 105 years old upon release—was a *de facto* life sentence. *Reyes*, 2016 IL 119271, ¶ 10. The court also noted that on remand the defendant, who would no longer be subject to a 25-year mandatory firearm enhancement, could receive as little as 32 years in prison, a sentence the court stated was "not a *de facto* life sentence." *Id.* ¶ 12.

¶ 96    Following *Reyes*, this court has had a number of opportunities to weigh in on where the line should be drawn when the sentence imposed falls somewhere between the two extremes set out in *Reyes*. In a number of cases, the court has expressed its reluctance to set a bright-line rule based solely on a defendant's age upon release or to attempt to predict the life expectancy of an individual defendant from actuarial data, including data based on race, ethnicity, gender, and a myriad of societal factors bearing on an individual's life expectancy. See, *e.g.*, *People v.*

*Jackson*, 2016 IL App (1st) 143025, ¶ 57 (concluding that "[t]hese are policy considerations that are better handled in a different forum"), *pet. for leave to appeal pending*, No. 121527 (filed Nov. 3, 2016). In others, the court has "recognize[d] the dilemma in grappling with such complex questions," but noted that it could "not see how justice is better served by avoiding them." *Buffer*, 2017 IL App (1st) 142931, ¶ 58, *appeal allowed*, No. 122327 (Ill. Nov. 22, 2017).

¶ 97    I fully agree with the majority in this case (*supra* ¶ 74) and those of my other colleagues who have concluded that it would be ill-advised for the appellate court to engage in fact-intensive determinations regarding the life expectancies of specific defendants, drawn from actuarial data and other evidence never presented to the circuit court or tested in an evidentiary hearing. But, in my view, that makes it necessary to establish a bright-line rule, one that can be used to apply *Reyes* fairly and consistently to those cases now working their way through the appellate review process, in which juvenile offenders received lengthy term-of-years sentences. I see no rational alternative for dealing with these cases. The State conceded that the juvenile defendant in *Reyes* would not survive his sentence, but surely the State should not be the arbiter of who benefits from a constitutional protection. We could remand with instructions for the circuit court to conduct an evidentiary hearing, with the goal of predicting this specific juvenile offender's life expectancy—though I think it highly unlikely that any such prediction would exceed the 64-year figure for adult offenders incarcerated in federal prison apparently used by the United States Sentencing Commission (Commission) in its calculations. See *infra*. Or different panels of this court could continue to decide—in an arbitrary manner and with no real evidentiary basis—which sentences are survivable and which are not.

¶ 98    The United States Supreme Court has acknowledged both the difficultly and the necessity of establishing certain bright-line rules based on a defendant's age. In *Roper*, for example, when

it established 18 years of age as the cutoff for a defendant to receive the special sentencing considerations afforded to juveniles, the Court noted that its holding would be subject "to the objections always raised against categorical rules." *Roper*, 543 U.S. at 574. Recognizing that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18," the Court nevertheless concluded that, if the proven differences between juveniles and adults are to be honored at all, "a line must be drawn." *Id.* It settled on the age of 18 as "the point where society draws the line for many purposes between childhood and adulthood." *Id.* We face a similar situation. If the protection in *Reyes* for juveniles given *de facto* life sentences is to mean anything, a line must be drawn that demarks those sentences.

¶ 99    Here, although Sebastian does cite to some ethnicity-based actuarial data of the sort that we rejected in *Perez*, the primary argument he makes is that, even based on a conservative life expectancy figure established by the federal government and relied on by courts, his sentence is a *de facto* life sentence. I agree. This court has cited the Commission's preliminary quarterly data reports for the proposition "that a person held in a general prison population has a life expectancy of about 64 years." (Internal quotation marks omitted.) *Joiner*, 2018 IL App (1st) 150343, ¶ 87; *Buffer*, 2017 IL App (1st) 142931, ¶ 59; *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26; see also Deborah LaBelle, *Michigan Life Expectancy Data for Youth Serving Natural Life Sentences*, ACLU of Michigan Juvenile Life Without Parole Initiative (2012), http://www.lb7.uscourts.gov/documents/17-12441.pdf (last visited June 4, 2018). Courts in other states have likewise cited or relied on figures used by the Commission. See, *e.g.*, *Bear Cloud*, 2014 WY 113, ¶ 34 & n.8 (noting that in its reports the Commission "equates a sentence of 470 months (39.17 years) to a life sentence"); *Commonwealth v. Costa*, 33 N.E.3d 412, 419 n.3 (Mass. 2015) (same); *People v. Wines*, No. 336550, slip op. at 3 n.6 (Mich. Ct. App. Mar. 8,

2018) (*per curiam*) (citing the *Sanders* court's reliance on the 64-year life expectancy for federal prison inmates). Since 2005, the Commission has provided the reports to "Congress, the judiciary, the executive branch, and the general public with data extracted and analyzed from sentencing documents submitted to [it] by the courts." United States Sentencing Commission, Quarterly Data Report Fiscal Year 2017, intro. (Mar. 16, 2018), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2017_Quarterly_Report_Final.pdf

¶ 100   As this court has previously noted, data suggests that this estimate "probably overstates the average life expectancy for minors committed to prison for lengthy terms," because it is based on the average life expectancy of all federal prisoners, many of whom were not incarcerated as juveniles. *Sanders*, 2016 IL App (1st) 121732-B, ¶ 26. Time spent in prison undoubtedly has the potential to reduce one's life expectancy. *Id.* But here, there is no need to determine whether a lower benchmark might be appropriate. Under even this conservative estimate of 64 years, Sebastian's 50-year sentence, pursuant to which he will not be released until the age of 65, is a *de facto* life sentence.

¶ 101   Although the reasoning in the cases may differ, the results reached in a majority of this court's opinions addressing this issue, both before and after *Reyes*, are consistent with a rule that sentences resulting in a defendant's release at the age of 64 or older are *de facto* life sentences. See *Joiner*, 2018 IL App (1st) 150343, ¶¶ 83, 90 (*de facto* life sentence; 83 years old upon release); *People v. Smolley*, 2018 IL App (3d) 150577, ¶ 22 (*de facto* life sentence) and 80 years old upon release according to the Illinois Department of Corrections webpage, *Offender Search*, https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (IDOC website) (last visited Apr. 5, 2018); *People v. Evans*, 2017 IL App (1st) 143562, ¶¶ 14, 18 (not a *de facto* life

sentence; 62 years old upon release), *pet. for leave to appeal pending*, No. 122701 (filed Sept. 19, 2017); *Buffer*, 2017 IL App (1st) 142931, ¶¶ 62, 64 (*de facto* life sentence; 69 years old upon release); *People v. Morris*, 2017 IL App (1st) 141117, ¶ 30 (*de facto* life sentence; 109 years old upon release); *People v. Ortiz*, 2016 IL App (1st) 133294, ¶ 24 (*de facto* life sentence; 75 years old upon release), *pet. for leave to appeal pending*, No. 121578 (filed Dec. 30, 2018); *Sanders*, 2016 IL App (1st) 121732-B, ¶ 27 (*de facto* life sentence) and 67 years old upon release according to the IDOC website; *Nieto*, 2016 IL App (1st) 121604, ¶ 42 (*de facto* life sentence; 94 years old upon release), *pet. for leave to appeal pending*, No. 120826 (filed July 8, 2016); *Gipson*, 2015 IL App (1st) 122451, ¶¶ 66-67 (not a *de facto* life sentence; 59 or 60 years old upon release). But see *Perez*, 2018 IL App (1st) 153629, ¶¶ 37-38 (not a *de facto* life sentence; 70 years old upon release); *Hoy*, 2017 IL App (1st) 142596, ¶ 46 (not a *de facto* life sentence; 68 years old upon release), *pet. for leave to appeal pending*, No. 122911 (filed May 9, 2018); *Jackson*, 2016 IL App (1st) 143025, ¶¶ 57-58 (not a *de facto* life sentence) and 66 years old upon release according to the IDOC website.

¶ 102   I would join those who have adopted 64 years of age, a figure based on the average projected life expectancy for prisoners arrived at by the United States Sentencing Commission, as a benchmark for the age upon release that qualifies a sentence as a *de facto* life sentence. Because Sebastian's sentence exceeds even this conservative benchmark, I conclude that it is subject to our supreme court's holding in *Reyes*. Such a sentence may be imposed on a defendant who was under the age of 18 at the time of his crime only after a hearing in which the circuit court considers the relevant factors pertaining to the defendant's youth set forth in *Miller* and its progeny. *Reyes*, 2016 IL 119271, ¶ 10.

¶ 103   I also disagree with the majority's conclusion that we can discern from the record that the

circuit court in this case considered the *Miller* factors at sentencing. As the majority acknowledges, Sebastian was sentenced in March 2014, more than two years before our supreme court held in *Reyes* that *Miller* even applies in cases where juvenile defendants have received *de facto* life sentences. Relying on our supreme court's decision in *Holman*, 2017 IL 120655, the majority finds it sufficient that information bearing on the *Miller* factors was at least before the court. Although it is generally true that, on review, this court presumes that the circuit court considered all evidence offered in mitigation, this presumption breaks down where a "statement in the record, other than the sentence imposed, indicates that the court did not do so." *People v. Gramo*, 251 Ill. App. 3d 958, 971 (1993).

¶ 104    The judge in this case made it quite clear that she did not think *Miller* applied. When defense counsel started to address the *Miller* factors at sentencing, she stopped him, noted that she would not be sentencing Sebastian to a sentence of natural life in prison, and invited him to "tailor [his] argument" accordingly. In my view, these statements are completely antithetical to a presumption that the judge considered the *Miller* factors.

¶ 105    I find *Holman* inapplicable here for another reason. The court in that case specifically found that the juvenile defendant had no rehabilitative potential. *Holman*, 2017 IL 120655, ¶ 17 (" 'the Court believes that this Defendant cannot be rehabilitated' "). That conclusion was reflected in the sentence of natural life without parole that the court imposed. I do not believe that the court's conclusion in *Holman* that the defendant's sentence "passe[d] constitutional muster under *Miller*" can be separated from the clear emphasis it placed, in the preceding sentence of its opinion, on the circuit court's conclusion that the defendant's conduct "placed him beyond rehabilitation." *Id.* ¶ 50. The court in this case made no such finding and indeed sentenced Sebastian to a term of years that, although lengthy, was at the low end of the range of

possible sentences.

¶ 106    I do not view *Holman* as a license for this court to routinely look with hindsight on the sentencing decisions of circuit courts and to presume that the judges who imposed those sentences carefully considered a set of factors that, before *Reyes*, they had no reason to believe even applied. Our supreme court made clear in *Holman* that "age is not just a chronological fact but a multifaceted set of attributes that carry constitutional significance." *Id.* ¶ 44. Under *Miller* and *Montgomery*, a sentence of life without parole for a juvenile offender is only appropriate in the very rarest of cases where "the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46.

¶ 107    As those cases make clear, a court cannot reach such conclusions by considering only "generally mitigating circumstances related to a juvenile defendant's youth," but must instead "consider specifically the characteristics mentioned by the Supreme Court." *Id.* ¶¶ 42-44 (rejecting the former approach in favor of the latter). The relevant considerations are:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

There is simply nothing in the record from which one can conclude that the circuit court in this

case considered each of these factors before sentencing Sebastian to 50 years in prison, and, indeed, the judge made it clear that she did not believe these factors applied. Moreover, there is nothing that suggests that the sentencing judge considered Sebastian to be "beyond the possibility of rehabilitation."

¶ 108   In sum, I would hold that Sebastian's 50-year sentence for first degree murder, pursuant to which he will not be eligible for release until the age of 65, is a *de facto* life sentence. Because this sentence was imposed on a juvenile offender without consideration of the factors pertaining to youth set out in *Miller* and now made a part of the Unified Code of Corrections (see 730 ILCS 5/5-4.5-105 (West 2016)), the sentence violates the eighth amendment. I would vacate Sebastian's sentence, affirm the judgment of the circuit court in all other respects, and remand this case for resentencing pursuant to section 5-4.5-105 of the Unified Code of Corrections. I would not find it necessary to reach the issue of whether Sebastian's sentence also violates the proportionate penalties clause of the Illinois Constitution.