2026 IL App (2d) 250113-U
No. 2-25-0113
Order filed May 27, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

DAVID M. WILLIAMS, Defendant-Appellant

Appeal from the Circuit Court of Kane County.
Honorable Donald M. Tegeler, Jr., Judge, Presiding.
No. 21-CF-1010

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The evidence was sufficient to sustain defendant's convictions.  (2) Trial counsel was not ineffective during closing arguments.  (3) Even if the trial court erred in admonishing the jury pursuant to Rule 431(b), neither prong one plain error nor ineffective assistance can be shown, where the evidence was not closely balanced. (4) Counsel was not ineffective for failing to challenge the firearms identification testimony either by not seeking a *Frye* hearing or via cross-examination.  (5) There was no cumulative error.  Affirmed.

¶ 2    After a jury trial, defendant, David M. Williams, was found guilty of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1), 12-3 (West 2022)) and attempt armed robbery (*id.* §§ 5/8-4(a), 18-2(a)(2)) and was sentenced to consecutive terms of six years' and four years' imprisonment, respectively.  Defendant appeals, arguing that: (1) the evidence was insufficient to

sustain his convictions; (2) trial counsel was ineffective, where, during closing argument, he distorted the burden of proof; (3) he was denied his right to a fair and impartial jury, where the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); (4) counsel was ineffective for failing to challenge the firearms identification testimony by not seeking a *Frye* hearing (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) and via cross-examination; and (5) the cumulative prejudice resulting from counsel's errors rendered the verdict untrustworthy of confidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4       On June 24, 2021, the State indicted defendant on 10 counts. Prior to trial, it moved for a *nolle prosequi* of seven counts, leaving counts VI and VII for trial. In count VI, the State alleged that, on June 1, 2021, defendant committed aggravated battery with a firearm, a class X felony, by knowingly discharging a firearm causing injury to Angel Juarez by shooting him on the body. In count VII, the State alleged that, on June 1, 2021, defendant committed attempt armed robbery, a class 1 felony, where, with the intent to commit armed robbery, defendant performed a substantial step toward the commission of that offense while carrying a firearm and knowingly demanding cannabis from Juarez by threatening the imminent use of force.

¶ 5       The State's theory of the case was that, on June 1, 2021, after arranging a deal to purchase cannabis, two black men, one of whom (defendant) was armed with a gun, walked to the Woodman's store parking lot from an apartment building on Oak Street in North Aurora and approached Juarez's car to rob him. One of the men, Brandon Linton, wore a white sweatshirt, and the other man, defendant, wore a gray sweatshirt with the hood up and was shorter than Linton. The men entered Juarez's car, with the gunman—defendant—getting in the front seat. Linton and Juarez were shot, and defendant left the scene, running toward the Oak Street apartments. About

one hour later, defendant was arrested in an Oak Street apartment, and a firearm and gray sweatshirt were located in separate rooms in the apartment.

¶ 6                                          A. Jury Selection

¶ 7      During jury selection, the trial court asked each group of six jurors whether they understood and accepted each principle and then individually read off the jurors' numbers to obtain responses from the jurors.  However, the court did not call out juror No. 45's number after asking his group members if they accepted and understood that, before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt.

¶ 8      At the conclusion of questioning juror No. 45's group, the court noted that juror No. 45 had previously been a witness and confirmed this with juror No. 45.  The court then asked juror No. 45 several questions about that experience and then inquired if juror No. 45 had ever previously served on a jury.  After juror No. 45 responded, the court stated, "Okay.  All right.  I know that you've heard if you've been listening, which I'm assuming you have.  You heard a lot of the questions.  Anything you've heard today that causes you any concern about sitting as a juror today?"  Juror No. 45 responded, "No."

¶ 9                                          B. Trial Witnesses

¶ 10                                        1. Vincent Desmond

¶ 11     Trial commenced in September 2024.  Vincent Desmond works at Woodman's grocery store at 151 Hansen Boulevard in North Aurora.  Between 2016 and 2022, he worked in loss prevention at the store.  On June 1, 2021, at about 5:20 p.m., Desmond was in the store parking lot, off of work and speaking to one of his friends.  He faced north toward the Oak Street apartments.  Desmond heard a "pop" sound, believing it was a gun shot.  He looked left and

observed a car coasting, hitting the back of the median, drove up the median, and then coming down to a stop.

¶ 12    Desmond saw Linton, whom he knew, limp from the car.  Linton had been a "problem" for the store for almost one year, stealing goods multiple times, and Desmond had told Linton that he was not allowed on the property.

¶ 13    Earlier on June 1, Desmond saw Linton in the store and saw on closed circuit television that he stole merchandise.  Linton wore a white hoodie, black pants, and a cross-body bag.  Store personnel did not approach Linton that day.  After Linton exited the store, Desmond followed him to see where he lived.  Police had not identified him before this, and Desmond did not have Linton's address.  He knew Linton lived across the street, based on video footage, which depicted a partial view of the entrance for apartments across Oak Street (*i.e.*, north) from Woodman's.  The apartments are two-story, multi-unit apartments.  They are 1,000 feet from the store.  Desmond reached the apartments and saw Linton in the open garage of one unit next to his vehicle.  He was dressed the same as he was in the store.

¶ 14    When Desmond saw Linton after he heard the "pop," Desmond was about 50 yards away from Linton.  Linton was limping away from the car and toward the apartment building.  Initially, Linton was alone, but, after he started limping toward the apartment building, Desmond saw another individual (whom the State alleged was defendant).  The individual wore a gray hoodie with the hood up and black pants.  The individual helped Linton by putting his arm around him and helping him toward the apartment.  According to Desmond, the individual was much shorter than Linton.  Eventually, the individual separated from Linton and started running north toward the Oak Street apartments.  (Desmond identified the individual in several photographs (People's

- 4 -

exhibit Nos. 12 and 13). Consistent with Desmond's testimony, he is wearing a gray hoodie with the hood up and black pants and is running toward the apartments.)

¶ 15　After the individual ran away, Linton ended up on the side of the curb at a field, being helped by a woman in a blue Jeep. At this time, Desmond had 911 dispatch on the phone, tried to get information from others at scene, and relayed to 911 dispatch what he and others saw.

¶ 16　Desmond spoke to police that day and then went to the store's loss prevention office. He viewed, with police, store surveillance videos of the parking lot around 5:20 p.m. that day. One video depicted two individuals entering a car that pulled up. The car then pulled into a parking space. The same two individuals exited the car, and one limped through the grass and was carried by the other one. The car drifted toward the back median and onto it. Linton was the person limping in the video. The videos also depicted Linton and the individual in the gray hoodie running toward Oak Street.

¶ 17　　　　　　　　　　　　2. Sadie Gosnell

¶ 18　Sadie Gosnell, an officer with the City of De Kalb, testified that, on June 1, 2021, at about 5 p.m., she was off duty and shopping at the Woodman's store. As she parked her car, she heard two or more "pops." She pulled her car around to where the noises were coming from and observed two males walking in the grassy field adjacent to the parking lot. She asked the man who was limping if he had been shot and offered assistance. Gosnell applied a tourniquet to his leg and applied pressure to stop the bleeding. The man was a black young adult. The second individual left, walking toward Oak Street.

¶ 19　　　　　　　　　　　　3. Virginia Zeiger

¶ 20　Virginia Zeiger worked at Woodman's on June 1, 2021. At around 5:20 p.m., she sat in her car during her break, with the car facing the store. The windows were down because she smoked.

Zeiger heard a "pop" and looked up. She then heard a second "pop" from her left. Zeiger observed a car two car-lengths away go by with two individuals fighting in the front seats. She then observed two individuals exiting the car from the front passenger side. One individual was a black male wearing a gray hoodie, black pants, and braids in a ponytail. Neither individual appeared to be injured, and they walked toward the grassy part of the parking lot.

¶ 21    Zeiger called 911 and approached the vehicle because the dispatcher asked questions about the car. Once she reached the driver's side of the car, she saw a young Hispanic man who was not very responsive. He appeared to have a wound on his neck. The man asked for help, stating that he did not want to die.

¶ 22    On cross-examination, Zeiger testified that she was about one-half of the parking lot away from the vehicle. However, she had a "very good view" and gave the dispatcher a "play by play." She was playing Candy Crush on her phone prior to hearing the "pops."

¶ 23                                    4. Baldemar Perez

¶ 24    Baldemar Perez worked for Comcast at a building in front of the Woodman's store on June 1, 2021, at around 5:20 p.m. He observed two males walking toward the store, about 10 feet away from him. One man was tall, and the other man was shorter. The shorter man wore a black sweatshirt with a hood on. A couple of minutes later, Perez heard "bom, bom" over the sound of his machinery. About one minute later, he observed the taller man sitting on the ground, about 800 feet away. He saw the shorter man running toward the road and field, toward houses.

¶ 25                                    5. Angel Juarez

¶ 26    Angel Juarez testified that, on June 1, 2021, he was shot on the left side of his neck and sustained nerve damage to the left side of his body. He does not recall where he was at around 5 p.m. that day. Juarez recalled that, around noon or 1 p.m., he was with his teacher at Plainfield

South High School, helping with tutoring lessons. Afterward, he had an argument with his mother. He is familiar with the Woodman's store because he has family in the area.

¶ 27    In response to the State's questions about the incident and his recorded conversations with police, Juarez repeatedly responded that he could not recall his statements. Juarez could not recall if, at about 5:20 p.m. on June 1, 2021, he went to the Woodman's parking lot. He recalled only that, after school, he woke up in the hospital intensive care unit with his mother by his side. Juarez had access to a car that day: his mother's gray Honda Elantra. He drove it to school. Juarez could not recall if he was involved in a transaction to sell "weed" in the parking lot of the Woodman's store that day or meeting two people who got into his car in the parking lot. When asked if he fought with anyone inside his car, he testified that he could not recall. However, Juarez responded in the affirmative when asked if he saw a gun in his car at the parking lot on June 1, 2021, and, "When I close my eyes, I can hear a bang." He could not recall who held the gun and denied that he had access to a gun that day.

¶ 28    Juarez further testified that he could not recall speaking to police, being in an ambulance, or speaking to paramedics. He also could not recall if he responded, "Nope," when Detective Kristen Lohrstorfer asked him what he saw before he got shot. Juarez could not recall if he responded, "I was just buying. Okay?" when asked by police how they were going to help him, and if he stated, "yeah, yeah" when asked if he was riding in his car by himself. Juarez also could not recall if he stated, "Just the guy I was buying from" when asked if there was anyone else with him and "Yes, I just need, hey, I was going to my cousin's" when asked if the guy was the one who shot him. Juarez could not recall being asked if he was going to his cousins', if a guy he was buying from came up and shot him, and, then, responding "Yeah" and that he was buying

"Marijuana." When asked if he responded, "I can't," when asked if he saw the man he was going to buy the marijuana from, Juarez testified that he could not recall.

¶ 29   Juarez answered that he could not recall if he stated that, "A dude texted me" when asked who told him to go to "this guy." He also could not recall if he stated that he "fought him" when asked if he saw the man with the gun. He also could not recall stating that he "dodged the bullet" when asked who fought first, and could not recall stating, "He upped it. I thought he shot, dodged the bullet, started fighting again, slammed on the gas." When asked about a question concerning what the man looked like, Juarez could not recall if he answered, "It happened fast."

¶ 30   While at the hospital and with his mother present, Juarez met with detectives Joseph Gorski and Dilley[1] (first name not contained in the record) and spoke about the shooting, telling them he was shot in the neck. He also told detectives that the shooting occurred at Woodman's. Juarez only vaguely recalled the conversation, because he was on pain medications. He recalled seeing a gun during the shooting and that the incident occurred very quickly. However, Juarez responded that he could not recall if he told the detectives, "We met up, met up in the parking lot. I go right side, park, and he's just—The next thing I know I turned on my right and there's just a gun in my face." He also could not recall giving the following response: "He was like, he got the stuff— Well, like when I turned right and there's just a gun on my face and I just—I was scared, no gun," "So I smacked it," "going towards the back seat," the gun went off, "then the dude started fighting for it in the front seat." Juarez could not recall if he stated that he started bleeding or that he held onto the gun and the gun went off again. He also responded that he could not recall answering, "One," when asked how many people he was supposed to meet up with but that, instead, "Two" ended up showing up.

---

[1]In the record, Dilley's name is also spelled "Dilly." For consistency, we use Dilley.

¶ 31    Juarez further responded that he could not recall to questions asking if he told the detectives that the men contacted him via Snapchat to make a deal, that Juarez "was supposed to give them some weed," 14 grams, or that the men told him to go to Woodman's. He could not recall if he told the detectives that the gun came out as soon as he parked, that he looked to his right and saw a gun in his face, or that the gun was brown and a "semi."

¶ 32    He could not recall if he stated that the shooter just sat down when he first got in the car, that the man wore a gray hoodie, and that Juarez also wore a gray sweatshirt. Juarez also could not recall stating, "I don't know what they wanted. They just wanted to rob me," and, in response to being asked who was the man with the gun, stating, "Gray sweatshirt. Okay. Because my sweatshirt was gray."

¶ 33    Juarez could not recall if he brought an additional seven grams of "weed" for another purpose that day or if he had about one dozen vape cartridges with him. That day, June 1, 2021, was not his first drug deal. He was never charged with dealing drugs on June 1, 2021.

¶ 34                              6. Officer Kathryn McCoy

¶ 35    Officer Kathryn McCoy collected evidence at the scene. She also took photographs at the scene and at the apartment (1831 Oak Street, apartment No. 1510), including a certificate of graduation and birth certificate for Linton, a credit card and mail for Mykel Erickson, mail for Symone Moses, and mail for Kimberly Williams. McCoy also photographed a firearm in the northeast bedroom that was located under an air mattress. A gray zip-up hoodie was located and photographed in the southeast bedroom. McCoy also conducted a gunshot residue test on, and collected a buccal swab from, defendant and Mitchel. She described defendant as a shorter thin

black male, and Charles Mitchel[2] as a tall thin black male. At the hospital, she collected Juarez's clothing and the bullet removed from his body.

¶ 36                                    7. Katherine Sullivan

¶ 37    Katherine Sullivan, a forensic biologist with the Illinois State Police Joliet Forensic Laboratory, testified as an expert in forensic DNA analysis. Sullivan has testified for the defense side before. Sullivan received swabs recovered from a Glock 19 firearm and two buccal standards. She identified a mixture of DNA profiles from the Glock that she interpreted as coming from three people.

¶ 38    Addressing the buccal standard from Mitchel, she testified that she obtained a DNA profile that she was able to use for comparison. The DNA results from Mitchel reflected that it was eight times more likely that the DNA originated from Mitchel and two unknown individuals than if the DNA results originated from three unknowns. These results provided "limited support" for the proposition that Mitchel was a contributor to that mixture of DNA profiles.

¶ 39    Next, addressing defendant, Sullivan testified that she used two competing scenarios to compare defendant's DNA to results from the Glock swabs: one that the DNA originated from defendant and two unknown individuals, versus the DNA results originating from three unknown individuals. The DNA results were "approximately 2500 times for [*sic*] likely if the DNA originated from [defendant] and two unknown individuals than if the DNA originated from three unknown individuals." This analysis provides "moderate support" for the proposition that defendant was a contributor to the DNA profile on the gun. Defendant's DNA was not excluded from the results of the Glock firearm. This means he could potentially have been a contributor to the DNA that was found on the firearm.

_____

[2]In the record, Mitchel's name is also spelled "Mitchell." For consistency, we use Mitchel.

¶ 40                    8. Detective Kristen Lohrstorfer

¶ 41    Detective Kristen Lohrstorfer was in an ambulance with Juarez and Detective Gorski on June 1, 2021. Lohrstorfer video-recorded on her cell phone the conversation with Juarez, portions of which were played for the jury.

¶ 42                    9. Sergeant Joseph Gorski

¶ 43    On June 4, 2021, Sergeant Joseph Gorski went to the hospital with Detective Dilley to speak to Juarez. The conversation was recorded on Dilley's body camera, and portions were played for the jury.

¶ 44                    10. Officer Derrick Hight

¶ 45    Officer Derrick Hight testified that, on June 1, 2021, at about 6:20 p.m., he went to 1831 Oak Street, apartment No. 1510. There, he saw about 10 or 12 officers, some with guns drawn. Several officers spoke to a younger black female at the door, and two toddler-aged children were just inside the apartment door. Two males were in the residence: a taller, younger, skinnier black man and a shorter, younger black man. Sergeant Hight conducted a protective sweep and discovered under an air mattress a black, smaller, pistol-type firearm that looked like a Glock.

¶ 46                    11. Samantha Fitzgerald

¶ 47    The parties stipulated that Samantha Fitgerald, a latent print examiner with the Illinois State Police, would have testified that she examined the firearm and cartridges found in the apartment and that her examination revealed no latent prints suitable for comparison.

¶ 48                    12. Mary Wong

¶ 49    The parties stipulated that Mary Wong, a trace evidence analyst with the Illinois State Police, would testify as an expert in trace evidence analysis and comparison. She would testify about gunshot residue kits administered to defendant, Linton, and Juarez. As to defendant, Wong

would testify that he may not have discharged a firearm with either hand. If he discharged a firearm, the particles were not deposited, were removed by activity, or were not detected by the procedure. As to Linton, she came to the same conclusion. Finally, as to Juarez, Wong would testify that he discharged the firearm, contacted a primer-gunshot-residue-related item, or had his left arm in the environment of a discharged firearm.

¶ 50                                     13. Neda Johnson

¶ 51     Neda Johnson, Charles Mitchel's mother, testified that, on June 1, 2021, she owned a 9-mm Glock firearm with an extended magazine that she purchased from a gun store, Shoot Point Blank. She stored the Glock loaded. She also owned two 9-mm Ruger firearms.

¶ 52     Johnson described Mitchel as being 6 feet 5 inches or 6 feet 6 inches tall. Viewing People's exhibit No. 102, Johnson stated that one of the parties depicted in the photograph was Mitchel. He was dressed in a white and blue sweater jacket, black pants, and had dreadlocks. This is how he appeared in June 2021.

¶ 53     On June 6, 2021, at about 9:35 p.m., Johnson received a call from North Aurora police. She looked in her closet for her Glock firearm, which she kept in a box in the back of her closet. Johnson did not find it there. She never gave anyone permission to take the firearm. Johnson went to North Aurora to the Spring Orchard apartments, where she saw Mitchel being taken into custody. Mitchel was convicted of possession of the Glock. He did not have a Firearm Owners Identification card on June 1, 2021.

¶ 54                                     14. Pamela Scholz

¶ 55     The parties stipulated that Pamela Scholz, a forensic chemist with the Illinois State Police, would testify as an expert in forensic chemistry. She tested recovered items that contained 13.9 grams and 7.1 grams of cannabis.

¶ 56                              15. Amy Johnson

¶ 57    Amy Johnson processed the apartment. A black Generation 4 firearm was located in the southwest bedroom. It was ready to go or "hot." Johnson swabbed the gun for DNA. Her lab also conducted two test-fires of the gun, and Johnson processed Juarez's car. A shell casing was located in the chamber of the firearm and in the front passenger seat. Johnson testified that you can touch something and not leave a fingerprint.

¶ 58                              16. Jeffrey Parise

¶ 59    Jeffrey Parise, a forensic specialist in firearms and firearms identification with the Illinois State Police Forensic Science Command, testified that he has worked at the Command for 30 years and specializes in footwear and tire-track identification, as well as physical match. He addressed his education, training (including a two-year formal program by the Command), lectures he has delivered, and the fact that he has testified about 130 times as an expert in his field (for both the prosecution and the defense). He has six years of prospecting experience as a lab technician at a microbiology and parasitology lab, has attended courses in advanced serial number restoration, full auto conversions, and firearms trafficking by the Bureau of Alcohol, Tobacco, and Firearms, attended courses by Officer Hight in tool mark identification and other topics, attended four conferences by the Association of Firearm and Tool Mark Examiners, and has been a quality review coordinator for firearms spikes (and is currently a quality review coordinator for those examiners who work in footwear, tire track, and physical-match cases). Parise also has attended courses at factory-certified armor schools of Beretta, Colt, Glock, Smith & Wesson, and other manufacturers.

¶ 60    Parise addressed the types of examinations that he performs on firearms, explaining that there are two basic examinations: visual and microscopic. He explained how a comparison

microscope works and noted that an identification is based upon the reproduction of the class and individual characteristics. An elimination is based on the difference of class characteristics or differences of the individual characteristics. Parise also explained lands and grooves and individual characteristics (*i.e.*, those that are accidental and produced during the manufacturing process and during use). Parise also performs serial number restoration, range determination, full auto conversions, determines the caliber of bullets, the gauge of any shot shells submitted, and the caliber of any cartridge casings.

¶ 61 He testified that individual characteristics are complex patterns. On a bullet, it is a complex impressed pattern or striated pattern. "So these kind of look like if you were to take a comb in sand and pull it, it's basically think about it as a bunch of different lines that has spacing and it's different widths." For cartridge casings, "they can be a complex party of striations or a complex impress pattern or it could be a combination of both, a fresh pattern as well as a striated pattern."

¶ 62 Examinations and assessments entail looking for class characteristics, which are those that the manufacturer produces and place an object within a group of similar objects. For example, the caliber of the firearm, manufacturer, model, the number and types of lands and grooves, and the direction of twist. He also looks at the firearm itself to determine if it is operating properly, if the safeties are operating properly, and if it has been modified in any way. Parise also test-fires the firearm to determine if it is working as designed and to give him a known standard to use to compare the unknowns or evidence found at the crime scene.

¶ 63 The methodology he uses in the reproduction of class and individual characteristics is the accepted methodology within the field of evidence identification. His lab has a quality assurance program that includes a 100% peer review process, where another firearms examiner reviews Parise's work. There is also a 10% managerial review, with a manager or supervisor reviewing

10% of his cases. The quality review coordinator conducts a case file review on about five cases per year, along with a random re-analysis of two cases. Parise also has to take a proficiency test every year pertaining to his examinations. His lab is accredited under "ISO 17025." Before Parise makes a finding, a second examiner looks at his evidence and verifies it. Parise was qualified to testify as an expert in firearms and firearms identification.

¶ 64    Addressing the evidence in this case, Parise testified that he received: (1) a 9-mm fired bullet with six polygonal land and grooves with a righthand twist; (2) one Federal 9-mm Luger fired cartridge case; (3) another Federal 9-mm Luger fired cartridge case; (4) a Glock model 19 Gen 4 9-mm semiautomatic pistol with six polygonal lands and grooves and a righthand twist; and (5) an extended magazine and several unfired cartridges (17 Federal 9-mm Luger unfired cartridges). Parise explained the parts of a cartridge.

¶ 65    Addressing the Glock firearm, Parise noted that he examined it and test-fired the weapon. He noted that it had been modified to allow it to be folded in half (so as to be concealed easier), which was the first time he had seen this modification. It would still be able to have a magazine in it while folded. He addressed photographs he had taken of the weapon. Parise showed the jury the magazine, the unfired cartridges, and the test shots he fired. He also explained what a magazine is and noted the one in this case was manufactured by PMAG and held 21 rounds.

¶ 66    Addressing the two fired cartridge casings, Parise testified that, when he examined them, he noted their class characteristics. They were both Federal 9-mm Luger casings, both had an elliptical firing pin impression, and both had some sheer marks (*i.e.*, scraping) on the cartridge case. He also examined the Glock firearm and used the evidence ammunition—two of the submitted cartridges—for test-firing purposes. He made sure there were no extraneous markings

on the evidence ammunition before he used it. Parise examined the fired evidence, including the fired bullet, under the comparison microscope.

¶ 67    Parise opined that the two fired cartridge casings were fired by the Glock firearm, as was the fired bullet. He affirmed that his opinions were within the accepted procedures of his lab and its certification and that they are accepted in the field of firearms and tool mark identification.

¶ 68    On cross-examination, Parise testified again about the components of a cartridge and semiautomatic firearms and what happens when the trigger is pulled. He was aware that the police had test-fired the Glock. He noted that he packaged the expelled casings with other evidence after his test-fires. He cannot opine as to who fired the firearm.

¶ 69    On re-direct examination, Parise testified about the types of malfunctions that occur with semiautomatic pistols. He was unaware that, when the Glock was recovered, it had a cartridge in the chamber. That type of malfunction would be a failure to extract and eject.

¶ 70    The State rested. Defendant presented no evidence.

¶ 71                              C. Closing Arguments

¶ 72    During closing arguments, the State argued that the case was based on circumstantial evidence that pointed to defendant. It noted that Perez described a short black man with a gray hoodie; Zeiger described a short black man with braids, a gray hoodie, and black pants; and Johnson noted her son's tall stature. Desmond described Linton and his knowledge of him, which led police to 1831 Oak Street, where defendant was arrested and a gun was recovered. The State also addressed the DNA results from the gun, which provided moderate support for the proposition that defendant was a contributor to the DNA profile. It also noted Parise's testimony that the bullet in Juarez's neck came from the gun recovered at the 1831 apartment and McCoy's testimony that a gray hoodie was found at the apartment.

¶ 73 Trial counsel began by noting the State's burden of proof, the presumption of innocence, and the right to a jury trial. Counsel continued,

"Now, we don't have to do it like that. Think if we reversed these principles for just a second. The defendant would have the burden of proving he's innocent beyond a reasonable doubt. The defendant would be presumed guilty and the defendant would be forced to have their guilt determined by the government.

If that sounds terrible, it's because it is and makes for terrible places throughout the world. That's why we have these big three principles. America would rather have a guilty man go free than an innocent person be convicted.

I can ask that you do this, that you go back there and sign the not guilty verdict and you could do that proudly. You could do it proudly because each verdict that is passed in each courtroom in this country is an extension of the freedom that is given to us by these big three principles. I am not going to just ask that you find [defendant] not guilty. I am going to ask that you find him innocent. He is innocent of the charges in this case."

¶ 74 Further, counsel argued that the case could be viewed in three parts: the eyewitness testimony (noting that the evidence did not reflect any lineup evidence), forensic evidence (arguing there was an incomplete investigation, with certain evidence and people not being tested), and the absence of certain evidence, such as the lack of identification of defendant. As to the final part, counsel began by stating,

"Now let's talk about what's missing and why [defendant] is innocent. So this is the last bucket. This is more of just a general bucket because there is so much not here that I just want to kind of go over it with you. The most obvious thing is the missing identification of my client. He was only identified in court one time by an officer who saw

him sometime on June 1st, 2021 after the shooting. He was never identified by one other witness."

¶ 75 Counsel also noted that police did not swab Mitchel for gunshot residue, the gun, which he stole, belonged to his mother, and his DNA was on the gun. Also, counsel noted that the State did not call Mitchel to testify or provide evidence of his height, and counsel noted that Erickson's (who was connected to the apartment) prints were on the gun.

¶ 76 Trial counsel asserted that Detective Gorski's investigation was flawed,

"Gorski got this investigation wrong and that's what's happening here today and that's what the big three, presumption of innocence, right to a jury trial, burden guilty beyond a reasonable doubt, that's what they're all here to prevent. When somebody gets it wrong.

Gorski did not do a thorough investigation because he might not be right and this might not be as simple as he wants it to be. Instead, they, the Government, has put on limited evidence received by that defendant and hoping you will do the rest for them.

Earlier I spoke about America's desire to protect the innocent. Three contributors. [Defendant] is not guilty of aggravated battery firearm and attempted robbery. He is not guilty because he is innocent."

¶ 77 Counsel concluded, "Protect the innocent. Find [defendant] not guilty."

¶ 78 During rebuttal, the State asserted,

"Defendant wants you to believe he's innocent. Innocent. Think about that, ladies and gentlemen of the jury, what that word means. That he did nothing wrong. That he is the most unluckiest man in the world. The victim of the worst kind of conspiracy that you

can imagine. An innocent person sits in this courtroom right here, ladies and gentlemen. It's a travesty. An overzealous prosecution.

What evidence do you have of that? What credible evidence do you have that he is an innocent man there? Ladies and gentlemen, wishful thinking is not credible evidence.

Ladies and gentlemen, nobody should be surprised here that the defendant doesn't think there is enough evidence to convict. Not a single person out there, nobody in here, nobody in the world should be surprised that the defendant doesn't think there is enough evidence to convict him. But remember those instructions that Judge Tegeler gave you just a little while ago.

Did you get an instruction that we can only prove the defendant guilty if this table is happy with the evidence that we show? Absolutely not. It should surprise none of you that he wants different evidence, more evidence. We have shown enough evidence for you to find the defendant guilty beyond a reasonable doubt and that burden of proof is the constitutional burden of proof, whatever bucket or whatever it fits in in the defendant's grand scheme of things. It is the constitutional burden of proof. It is the burden of proof constituted in criminal cases. It is a good and just burden in this case. We have given you enough evidence for you to find the defendant guilty."

¶ 79 Finally, near the end of its rebuttal, the State argued,

"[Defendant] doesn't get a pass because, you know, he is here today claiming that he's innocent. He's here today for the things that he has done, what he has been proven guilty beyond a reasonable doubt of, and that is the aggravated battery of Angel Juarez, the attempt robbery—armed robbery of Angel Juarez."

¶ 80                    D. Verdict and Subsequent Proceedings

¶ 81    The jury found defendant guilty of both counts. The trial court denied defendant's posttrial motion and sentenced him to six years' imprisonment for aggravated battery with a firearm and a consecutive term of four years' imprisonment for attempt armed robbery. Defendant appeals.

¶ 82                              II. ANALYSIS

¶ 83    Defendant argues that: (1) the evidence was insufficient to sustain his convictions; (2) trial counsel was ineffective, where, during closing argument, he distorted the burden of proof; (3) he was denied his right to a fair and impartial jury, where the trial court failed to comply with Rule 431(b); (4) counsel was ineffective for failing to challenge the firearms identification testimony, both by not seeking a *Frye* hearing (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) and through his cross-examination; and (5) the cumulative prejudice resulting from counsel's errors rendered the verdict untrustworthy of confidence. For the following reasons, we reject defendant's claims.

¶ 84                         A. Sufficiency of the Evidence

¶ 85    Defendant first challenges the sufficiency of the evidence against him, arguing that the circumstantial evidence did not prove that he was present at the shooting, intended to commit robbery, or that the firearm recovered from the apartment was used in the shooting.

¶ 86    "When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Sauls*, 2022 IL 127732, ¶ 52. This standard applies whether the evidence is direct or circumstantial. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). We will not reverse a conviction on sufficiency grounds, unless the evidence was so "unreasonable, improbable, or unsatisfactory"

that, even when viewed in the light most favorable to the State, no rational trier of fact could accept it as proof beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). The findings made by the trier of fact regarding the credibility of witnesses, the inferences to be drawn from the evidence, and the resolution of conflicts in the evidence are all entitled to significant deference. *Id.*

¶ 87    Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant. *People v. Saxon*, 374 Ill. App. 3d 409, 417 (2007). A criminal conviction may be based solely on circumstantial evidence. *People v. Brown*, 2013 IL 114196, ¶ 49. The jury does not need to be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 88    "A person commits aggravated battery when, in committing a battery, he or she knowingly *** [d]ischarges a firearm *** and causes any injury to another person." 720 ILCS 5/12-3.05(e)(1) (West 2022). "A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." *Id.* § 12-3(a).

¶ 89    A person commits armed robbery when the person "knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force" (*id.* § 18-1(a)) and "he or she carries on or about his or her person or is otherwise armed with a firearm" (*id.* § 18-2(a)(2)). "A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." *Id.* § 8-4(a).

¶ 90   Defendant argues that the State's circumstantial case hinged on connecting him to a person described as wearing a gray sweatshirt, shorter than a taller man, and with "braids and a ponytail." These descriptions, he contends, amount to a common clothing item in a common color, a common height, and features that did not apply to his hair, which was in dreadlocks, not braided, and too short to be in a ponytail.  Further, defendant argues that the State did not prove that the person in the gray sweatshirt intended to rob Juarez, where the State merely argued at closing argument that the presence of the firearm at an illegal drug transaction equated to intent to commit robbery.  The State also presented evidence, he notes, that Juarez described the firearm that shot him as brown, but the firearm it tried to connect to defendant was black.  Defendant also argues that the State relied on Parise's unsupported conclusory opinion that the black firearm recovered at the apartment was the same one used to shoot Juarez.

¶ 91   Addressing Zeiger's testimony, defendant argues that she described the person in the gray sweatshirt as a black man, with hood down, and braids and a ponytail.  He contends that, on June 1, 2021, he did not have braids or hair long enough for a ponytail.  He had dreadlocks, which is a distinct hairstyle from braids, and it is not possible that he had braids in the Woodman's parking lot and dreadlocks one hour later.  Further, defendant contends that his hair was short and it was "unlikely" that it was long enough to be placed in a ponytail.  Thus, based on Zeiger's description, he could not have been the person in the gray hoodie.  Defendant further argues that the rest of the State's evidence concerning the shooter's appearance was that the person was shorter than Linton, whose height is not in the record.  Thus, the argument that defendant was shorter than Linton was speculative.  Defendant also argues that his height of 5 feet 7 inches was average for a man and does not corroborate the State's theory that he was the perpetrator.  The shooter's height was only established relative to that of Linton's, which was never established.

¶ 92    Next, addressing the DNA evidence, defendant argues that "moderate support" for the hypothesis that he was a contributor to DNA found on the firearm does not equate to a definitive confirmation that his DNA was on the firearm recovered from the apartment. This did not meet the State's burden of proof that defendant even handled the firearm, he asserts. He also argues that there was no connection between himself and Juarez's description of a brown gun that shot him. Defendant asserts that Sullivan's testimony that she identified three DNA profiles on the black gun, with moderate support for defendant's DNA, limited support for Mitchel's DNA, and no other identified source, reflects weak evidence connecting defendant to the black gun and does not place him in the Woodman's parking lot with a brown firearm.

¶ 93    Defendant also addresses the gray sweatshirt recovered from the apartment and argues that it is a common clothing item that was located in a bedroom separate from where the gun was located, that other adults were present in the apartment, and there was mail for others in the residence. This evidence, he asserts, does not permit a reasonable inference that the hoodie belonged to him or was worn by him.

¶ 94    Next, addressing the attempt armed robbery charge, defendant argues that Juarez's recorded statements showed that no words were exchanged in the car. He contends that there are many reasons a gun may be present during an illegal drug transaction and that the State's theory that the gun the person in the gray sweatshirt used was a step towards a robbery was mere speculation about intent.

¶ 95    Finally, addressing the firearms identification testimony, defendant argues that there was no factual antecedent to Parise's conclusory opinion that the two cartridge casings and bullet came from the Glock recovered in the apartment. Beyond his opinion, Parise's testimony, defendant asserts, at most showed he could determine when a common, commercially manufactured bullet

and cartridge came from a common, commercially manufactured gun. This was insufficient to connect the gun to the shooting. Noting Parise's comb analogy, defendant contends that it supported an idea that the same comb, like a commercially manufactured firearm, could create the same markings.

¶ 96 We reject defendant's argument. Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the required elements of the crimes beyond a reasonable doubt. In the citation issued upon his arrest, defendant's residence is listed as 1831 Oak Street, apartment 1510, in North Aurora. Defendant was arrested at this apartment. The citation further reflects that his height is 5 feet 7 inches and his weight was 130 pounds. A gray sweatshirt depicted in surveillance evidence and that Desmond, Zeiger, and Juarez testified (or were recorded as stating) the shooter wore was found in the apartment, as was a Glock 19 firearm, albeit in a separate bedroom. Further, Officer McCoy, who collected evidence at the apartment, did not describe defendant's height relative to Linton's. She described defendant as a shorter, thin black male, which is consistent with the information on the citation.[3]

¶ 97 Desmond, Gosnell, Zeiger, and Perez testified about hearing gunshots in the Woodman's parking lot on June 1, 2021, at around 5:20 p.m. Desmond testified about Linton and following him to an apartment earlier in the day, which is where defendant, the gray hoodie, and the Glock firearm were later located.

¶ 98 Juarez's statements reflected that he was contacted about someone wanting to purchase 14 grams of cannabis. When he arrived at the Woodman's parking lot, two men got into his car. The passenger in the front seat held a gun to his face, which Juarez knocked into the back seat,

---

[3]Defendant cites to a government website that allegedly states the average height for a male is 5 feet 8.9 inches.

discharging a bullet. The shooter grabbed the gun again, the men fought over it, and Juarez was shot in the neck. Parise, who testified about this background and training, opined that the bullet retrieved from Juarez's neck and cartridge casings found at the scene came from the Glock firearm found in defendant's apartment.

¶ 99 Sullivan, the DNA expert, testified that DNA found on the Glock that was compared to defendant's DNA reflected that it was 2500 times more likely to have originated from defendant and two unknown individuals as compared to three unknown individuals, which provided moderate support for the proposition that defendant was a contributor to the DNA results on the Glock. Thus, defendant's DNA was not excluded from the results of the Glock firearm, which meant, according to Sullivan, that he could potentially have been a contributor to the DNA profile found on the firearm.

¶ 100 Defendant's argument that Juarez described the firearm that shot him as brown, but the firearm the State tried to connect to defendant was black and that this undercut the State's assertion that Juarez was a credible witness, is unavailing. Defendant did not raise the discrepancy in the gun colors below. Regardless, it is the jury's duty to resolve conflicting testimony. *People v. McLaurin*, 2020 IL 124563, ¶ 22; see also *People v. Rodriquez*, 100 Ill. App. 3d 244, 248 (1981) (finding "[i]t is unrealistic to expect witnesses to a sudden, violent stabbing to describe it with 'stop action' accuracy," and "[t]he exact positions of the parties and the precise sequence of their actions would be difficult for anyone to recreate perfectly"). And Parise tied the Glock found in the apartment to the bullet recovered from Juarez and the spent cartridges at the scene, and Sullivan testified to DNA results that provided moderate support for the proposition that defendant was a contributor to the DNA results on the Glock.

¶ 101   Zeigler, who was either two car lengths or one-half of the parking lot away from Juarez's vehicle, testified that the black male in the gray hoodie and black pants had braids in a ponytail. Defendant asserts his hair was in dreadlocks, not braids, and could not be put into a ponytail. The trier of fact is responsible for assessing what weight should be afforded to any discrepancies in the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006) (the weight to be given witness testimony, including "resolution of inconsistences and conflicts in the evidence," is the responsibility of the trier of fact. [Citations.]").   Furthermore, People's exhibit No. 101, a photograph of defendant, reasonably reflects that his hair was in a twist style that could be considered or mistaken as braids and of a length that could be put into a ponytail.

¶ 102   For the charge of aggravated battery with a firearm, the State was required to establish that defendant knowingly and by means of discharging a firearm caused injury to Juarez by shooting him in the neck. The evidence was sufficient to sustain the jury's verdict on this charge. Records of Juarez's statements to police and his testimony reflected that Juarez stated of the shooter in the front passenger seat that he turned to his right and saw a gun pointed at his face, smacked it back, the gun went off, the men fought for it, the gun went off again, and he was shot in the neck. He could hear a "bang" when he closed his eyes. Juarez described the shooter as wearing a gray hoodie. Although it is a common clothing item, this does not diminish from the fact that a gray hoodie was found in defendant's residence, and it was for the jury to assess this evidence. See *People v. Hall*, 194 Ill. 2d 305, 330 (2000) (in a case where the defendant claims that he was not proved guilty beyond a reasonable doubt, each link in the chain of circumstances does not need to be proved beyond a reasonable doubt, if all of the evidence considered collectively establishes the defendant's guilt).

¶ 103   As to the charge of attempt armed robbery, the State needed to prove that defendant, with the intent to commit armed robbery, performed a substantial step toward the commission of that offense in that he, while carrying on or about his person or while otherwise armed with a firearm, knowingly demanded property—cannabis—from Juarez by threatening the imminent use of force. The evidence was sufficient to sustain the jury's verdict on this charge. The recordings of Juarez's statements and his testimony reflected that he was contacted by someone who wanted to purchase 14 grams of cannabis, which is one of the amounts Juarez brought with him that day. After the shooter got into Juarez's car, he pointed a gun at Juarez's face and a fight ensued. Juarez described the shooter as wearing a gray hoodie. He stated that he did not know what the men wanted, but they "just wanted to rob me." See *People v. Jones*, 234 Ill. App. 3d 1082, 1095 (1992) (substantial step toward an armed robbery occurred when the defendant exited "his car with a loaded gun, approached [the victim] and feigned an interest in obtaining drugs so as to create an opportunity to rob him. The jury could have reasonably inferred that if [the] defendant was only interested in buying drugs, a loaded pistol was not necessary.").

¶ 104   In sum, the evidence was sufficient to sustain defendant's convictions.

¶ 105                     B. Ineffective Assistance – Closing Argument

¶ 106   Next, defendant argues that trial counsel was ineffective where, during closing argument, counsel distorted the burden on the State to prove beyond a reasonable doubt each element of the crimes. During closing arguments, trial counsel repeatedly argued that the jury should find defendant innocent. In so arguing, defendant contends, counsel distorted the burden of proof and conveyed an argument that provided the jury with the options to find defendant innocent or to find him guilty. Defendant argues that, since it is never the defendant's burden to prove his innocence and he is presumed innocent, this fundamentally confusing argument distorted the State's burden.

Further, counsel's argument opened the door for the State to argue in rebuttal that defendant had not proved himself innocent. This was especially damaging, defendant urges, in a circumstantial case where the defense had not presented any case-in-chief. Counsel's performance was unreasonable and prejudicial, he argues, and this warrants a new trial.

¶ 107   The sixth amendment to the United States Constitution guarantees defendants the right to the assistance of counsel for their defense (U.S. Const., amends. VI, XIV), and " 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). Under *Strickland*, a defendant alleging that counsel was ineffective has the burden of showing both deficiency and prejudice. *Id.* at 687. To satisfy the deficiency prong, "the defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). To satisfy the prejudice prong, "[t]he defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *People v. Houston*, 229 Ill. 2d 1, 4 (2008). Because a defendant must satisfy both prongs to prevail, courts need not "address both [prongs] of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *Evans*, 186 Ill. 2d at 94.

¶ 108   Counsel's performance is measured by an objective standard of competence under prevailing professional norms. *Id.* In considering whether counsel's performance was deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To overcome this presumption of soundness, the strategy "must appear irrational and unreasonable in light of the circumstances that defense counsel faces at the time" such that "no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strateg[y]." *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997). We do not focus on "isolated incidents of conduct" but, instead, "look to the entire record to determine if under all of the circumstances counsel's assistance was ineffective." *People v. Cloyd*, 152 Ill. App. 3d 50, 57 (1987).

¶ 109   The right to the effective assistance of counsel applies to closing arguments where "counsel has wide latitude in deciding how best to represent a client." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). To establish ineffective assistance based on comments made during closing argument, the defendant must overcome the strong presumption that counsel was competent and that the remarks were part of a reasonable trial strategy. *People v. Davis*, 356 Ill. App. 3d 725, 730 (2005).

¶ 110   When, as here, a claim of ineffective assistance of counsel was not raised in the trial court, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 111   Defendant concedes that, prior to closing arguments, the trial court instructed the jury on the law, including the State's burden of proof. But, during closing arguments, trial counsel stressed that he was asking the jury to find defendant innocent. This argument, defendant argues, was risky and confusing, because it is never the defendant's burden to prove his own innocence. Counsel's rhetorical device, he contends, was an attempt at a strategy, which is ordinarily not a basis for finding ineffective assistance; however, there was no reasonable defense strategy that justified a defendant's taking on a burden to prove his own innocence.

¶ 112   Defendant further argues that he was prejudiced by counsel's improper closing argument. By putting forth an argument that the jury should find him innocent, trial counsel opened the door for the State to rebut this flawed innocence argument to highlight that defendant did not prove his innocence.  Defendant also contends that counsel's tactic of seeking a finding of innocence for his client was prejudicial due to the failure of the defense to present any evidence.  This would have confused the jury.  It heard the instruction that defendant was presumed innocent, but the attorneys argued over whether he was innocent, thereby, making innocence an issue.  He could not have a fair trial where the jury was left with the impression that it was deciding defendant's innocence or guilt and that there was any burden on defendant to prove his innocence.

¶ 113   Defendant notes that the instruction that he did not have to prove his innocence was one sentence, while trial counsel's closing argument hammered the point that the jury should find defendant innocent, which is not an option this jury had.  Then, he contends, the State used rebuttal to make it clear that defendant, who presented no case-in-chief, had provided no credible evidence of his innocence, was the unluckiest man in the world, and wanted to go after a mystery person. Thus, the combination of counsel and the State's closing arguments left the jury with the impression that it was deciding whether defendant was innocent or guilty.

¶ 114   We conclude that trial counsel did not render deficient performance.  Read in context, counsel's arguments did not ask the jury to decide if defendant had proven his innocence.  Rather, counsel noted to the jury the three principles ("presumption of innocence, right to a jury trial, burden guilty beyond a reasonable doubt") and that defendant did not have to prove his innocence. Counsel continued, asking the jury to "find him innocent.  He is innocent of the charges in this case."  But he also referenced the "presumption of innocence" and concluded, "Protect the

innocent.  Find [defendant] not guilty."  We cannot conclude that the foregoing would have confused the jury or improperly shifted the burden of proof.

¶ 115  Further, the State's rebuttal argument did not improperly shift the burden of proof.  The State began by noting that defendant wanted the jury to believe that he was innocent and asked, "What evidence do you have of that?"  However, the State immediately followed by noting that defendant did not believe there was sufficient evidence to convict.  The State asserted that it had "shown enough evidence for you to find the defendant guilty beyond a reasonable doubt and that burden of proof is the constitutional burden of proof[.]  *** We have given you enough evidence for you to find the defendant guilty."  Finally, the State referenced that defendant was claiming he was innocent and argued, "He's here today for the things that he has done, what he has been proven guilty beyond a reasonable doubt of, and that is the aggravated battery of Angel Juarez, the attempt robbery—armed robbery of Angel Juarez."  These comments overall reflect an accurate recitation of the State's burden of proof.

¶ 116  In sum, we reject defendant's argument that trial counsel rendered ineffective assistance during closing arguments.

¶ 117                                    C. Jury Admonishment

¶ 118  Defendant next argues that he was denied his right to a fair and impartial jury, where the trial court failed to properly admonish, pursuant to Rule 431(b), one juror of the second *Zehr* principle.  He admits he did not preserve this issue for appeal but contends that we may review it under the first prong of the plain-error doctrine because the evidence was closely balanced (*People v. Birge*, 2021 IL 125644, ¶ 23) or as ineffective assistance of counsel.

¶ 119  An unpreserved error may be considered on appeal under the plain-error doctrine, if (1) "a clear or obvious error occurred and the evidence is so closely balanced that the error alone

threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* ¶ 24. The defendant bears the burden of persuasion under both prongs. *Id.* However, the Illinois Supreme Court has held that a "Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury." *People v. Sebby*, 2017 IL 119445, ¶ 52. Defendant asks that we review the issue under prong one. The first step under the plain-error doctrine is determining whether a clear or obvious error occurred, which we review *de novo*. *Birge*, 2021 IL 125644, ¶ 24. We also review *de novo* the trial court's compliance with Rule 431(b). *People v. Thompson*, 238 Ill. 2d 598, 606 (2010).

¶ 120　Rule 431(b) was adopted to ensure compliance with the requirements of *Zehr*. See Ill. S. Ct. R. 431(b), Committee Comments (rev. July 1, 2012) (rule "seeks to end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law"). The rule provides:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 121   Rule 431(b) "mandates a specific question and response process." *Thompson*, 238 Ill. 2d at 607.  The court must ask each potential juror if they *understand and accept* each of the principles in the rule and, "the rule requires an *opportunity for a response* from each prospective juror on their understanding and acceptance of those principles." (Emphasis added.)  *Id.*  The trial court need not "recite the principles separately to the prospective jurors" and the rule "does not require the court to explain the principles to the jurors in any particular fashion." (Emphasis omitted.) *Birge*, 2021 IL 125644, ¶ 34.

¶ 122   The rule does not require the court to seek a verbal response from each prospective juror or for the court to individually admonish each individual prospective juror. *Birge*, 2021 IL 125644, ¶¶ 27, 41 (show of hands by the jurors is sufficient).  "The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of those principles." *Thompson*, 238 Ill. 2d at 607.  In *People v. Perry*, 2011 IL App (1st) 081228, ¶ 73, for example, the reviewing court held that there was a Rule 431(b) violation, where the trial court asked if there was "any juror who feels honestly and sincerely that they cannot follow any of the basic principles I just talked about, such as presumption of innocence, burden of proof[.]  Any juror who feels a dispute and cannot follow one of these principles?"

¶ 123   Here, after asking juror No. 45's group if it accepted and understood that, before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt, the trial court did not call out juror No. 45's number to seek an individual response.  However, at

the end of questioning juror No. 45's group and questioning the juror individually about other matters, the court asked juror No. 45, "You heard a lot of the questions. Anything you've heard today that causes you any concern about sitting as a juror today?" Juror No. 45 responded, "No."

¶ 124   We conclude that, even if the court erred in questioning juror No. 45, the evidence was not closely balanced and, therefore, defendant cannot show prong one plain error. On this argument, defendant relies on the same points he raised in challenging the sufficiency of the evidence. We reject his argument and agree with the State that there was little evidence favorable to defendant, the conflicts in the witnesses' testimony involved minor details, and there was no indication that the State's witnesses were unreliable. The evidence reflected that the man with Linton was a short (defendant's height is 5 feet 7 inches) black man who wore a gray hoodie, which was corroborated on surveillance video. The video also showed that the man initially assisted Linton and then ran toward the Oak Street apartments, where Desmond testified he discovered Linton lived. Defendant was found and arrested in the same apartment, and a gray hoodie and the Glock firearm Parise linked to the bullet recovered from Juarez's body and cartridges from scene were found in that apartment. Sullivan, the DNA expert, opined that it was 2,500 times more likely that defendant's DNA and that of two other unknown individuals was on the gun, versus three unknown individuals. Therefore, the evidence was not closely balanced.

¶ 125   We also reject defendant's ineffective-assistance argument. Defendant has not shown that he was prejudiced by counsel's performance. That is, he cannot show that, even if defense counsel had objected, the court would have again admonished juror No. 45 about the second *Zehr* principle, that the juror would have answered in the affirmative, and the result of the trial would have been different (where, as we discussed above, the evidence was not closely balanced). See *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 81 ("The overwhelming evidence of [the] defendant's guilt

in this case precludes [the] defendant from being capable of showing that there was a reasonable probability that the outcome of the case would have been different if" error had not occurred).

¶ 126   In sum, we reject defendant's arguments concerning the jury admonishment.

¶ 127               D. Ineffective Assistance – Firearms Identification Testimony

¶ 128   Next, defendant argues that he received ineffective assistance of counsel, where trial counsel did not challenge Parise's firearms identification testimony, specifically, by failing to request a *Frye* hearing and by failing to cross-examine Parise regarding growing scientific controversy over the reliability of firearms identification and comparison testimony.

¶ 129   Preliminarily, we note that we will consider a claim of ineffective assistance of counsel for the first time on direct appeal, unless the claim depends on facts not in the record on appeal.  See *People v. Veach*, 2017 IL 120649, ¶¶ 46-48.  The State argues that we should not consider defendant's argument because it is dependent on evidence from outside the record that was not represented to the trial court and is raised for the first time on appeal.  It contends that the claim can only properly be brought in postconviction proceedings.  We disagree.  Defendant utilized his cited authority to support his claim that the availability of such authority shows that trial counsel should have been aware of criticisms of firearms identification and comparison testimony and, thus, challenged Parise's testimony and opinion.  He does not use the authority to prove the unreliability of firearms testimony.  Thus, defendant's authority does not constitute evidence outside the record.  See, *e.g.*, *People v. McKown*, 226 Ill. 2d 245, 273-74 (2007) (citing articles).  Our standard of review is *de novo*.  *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 40.

¶ 130                                   1. Frye

¶ 131   Defendant notes that, at trial, Parise testified as an expert in firearms and firearms identification and opined that the bullet recovered from Juarez's body and the two cartridge casings

from the scene were fired by the firearm recovered at the apartment where defendant was arrested. He contends that this testimony, coupled with the "moderate support" that defendant's DNA was on that firearm, were key pieces of evidence in a case that would otherwise consist of the identification of defendant as a shorter black male in an apartment where a gray hoodie was found. Counsel, he notes, did not challenge Parise's testimony. Defendant argues that "mounting" evidence has challenged the validity and reliability of firearms identification testimony, and Parise's opinion could have been excluded under the *Frye* general acceptance test since the scientific methodology can be considered "new" or "novel" and no *Frye* hearing has been held on firearms identification testimony in Illinois. Trial counsel, he asserts, provided ineffective assistance, and he requests that we reverse his convictions and remand for a new trial.

¶ 132 The decision whether to pursue an admissibility challenge under *Frye* is a matter of trial strategy. *People v. Gordon*, 378 Ill. App. 3d 626, 639 (2007); see also *People v. Bew*, 228 Ill. 2d 122, 127-28 (2008) (noting that the decision whether to file a motion to suppress is a matter of trial strategy). Our supreme court has directed that counsel's strategic decisions made after an investigation of the law and the facts are "virtually unchallengeable" (*People v. Palmer*, 162 Ill. 2d 465, 476 (1994)) or "virtually unassailable" (*People v. Ramsey*, 239 Ill. 2d 342, 433 (2010)). In other words, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel fails to conduct any meaningful adversarial testing. *People v. Patterson*, 217 Ill. 2d 407, 441 (2005); *People v. Guest*, 166 Ill. 2d 381, 394 (1995). "[T]he defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *Evans*, 186 Ill. 2d at 93. The failure to file a motion does not establish incompetent representation when the motion would have been futile. *Patterson*, 217 Ill. 2d at 438.

¶ 133  In Illinois, the *Frye* standard governs the admission of scientific evidence.  *In re Detention of New*, 2014 IL 116306, ¶ 25.  The standard is codified in Illinois Rule of Evidence 702 (eff. Jan. 1, 2011):

> "Where an expert witness testifies to an opinion based on a new or novel scientific methodology or principle, the proponent of the opinion has the burden of showing the methodology or scientific principle on which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs."

¶ 134  The purpose of *Frye* is "to exclude new or novel scientific evidence that undeservedly creates 'a perception of certainty when the basis for the evidence or opinion is actually invalid.' " *New*, 2014 IL 116306, ¶ 26 (quoting *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78 (2002), abrogated on other grounds by *In re Commitment of Simons*, 213 Ill. 2d 523, 530 (2004)).  Under *Frye*, scientific evidence is admissible at trial only if it is based on a methodology or principle that is generally accepted in the relevant scientific field.  *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004).  To qualify as "generally accepted," the methodology or principle in question need not have gained universal acceptance or even be accepted by a majority of experts in the relevant field.  *Id.*  Instead, it is sufficient that the methodology underlying the expert witness's opinion is reasonably relied upon by experts in the field.  *Id.* at 530.  Additionally, the *Frye* standard applies only to scientific methodologies that are "new" or "novel."  *Id.*  A scientific methodology is considered "new" or "novel" in this context if it is original or does not resemble something formerly known or used.  *Id.*  A trial court may decide that a scientific methodology or principle is generally accepted by either (1) holding an evidentiary hearing or (2) taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject. *McKown*, 226 Ill. 2d at 254.  Whether a scientific methodology is "generally accepted" within the

meaning of the *Frye* standard is reviewed *de novo*. *People v. Nelson*, 235 Ill. 2d 386, 430-31 (2009).

¶ 135 In *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 54, the defendant relied primarily on a 2009 report from the National Academy of Sciences and our supreme court's decision in *McKown* to argue that the trial court erred in admitting firearms identification evidence without holding a *Frye* hearing. *Id.* The reviewing court rejected the defendant's argument, concluding that "[t]oolmark and firearm identification evidence is not new or novel, either pursuant to the plain meaning of those words or in accordance with the analysis employed by our supreme court in *McKown*." *Id.* ¶ 61. It further determined that, "[f]ar from being unsettled, the law in Illinois is consistent in its admission of such evidence." *Id.* The *Rodriguez* court also distinguished firearms identification evidence from the horizontal gaze nystagmus test relevant in *McKown*, noting that the admissibly of firearms identification evidence was well-settled, whereas the latter had never been accepted after a *Frye* hearing in an Illinois court. *Id.* ¶ 58. The court also rejected the defendant's reliance on the National Academy of Sciences report, holding that "the report's concerns go to the weight and not to the admissibility of such evidence." *Id.* ¶ 62. Thus, it affirmed the admission of firearms identification evidence without the need for a *Frye* hearing. *Id.* ¶ 62; see also *Robinson*, 2013 IL App (1st) 102476, ¶ 91 (same).

¶ 136 Here, defendant argues that, although reviewing courts previously considered the testimony and opinions of firearms examiners to be admissible, recent decisions show that the general acceptance of firearms comparison and identification testimony, such as the type offered by the State in this case, is unsettled. *Abruquah v. State*, 296 A.3d 961 (Md. 2023); *People v. Kimberley*, No. 22 C.R. 02932 01 (Cir. Ct. Cook County Jul. 1, 2025). Thus, he asserts, trial

counsel should have requested a *Frye* hearing to determine the admissibility of Parise's testimony and opinion and the failure to do so constituted ineffective assistance.

¶ 137   Defendant acknowledges this background but argues that new developments and court challenges show that the issue of the evidence's admissibility is unsettled and can be considered novel by this court.  See *Abruquah*, 296 A.3d at 968, 997 (applying *Daubert-Rochkind* standard and holding that a ballistics expert can testify that bullets at a crime scene are consistent with patterns on bullets fired from a suspect's gun but cannot offer an "unqualified opinion" of a match between them; reports, studies, and testimony relied on by the examiner did not demonstrate that the firearms identification methodology employed in the case could reliably support an unqualified conclusion that the bullets were fired from a particular firearm); *State v. Adams*, 572 P.3d 291, 313 (Or. Ct. App. 2025) (holding that the State failed to meet its burden to establish the foundational requirements for scientific evidence under *State v. Brown*, 687 P.2d 751 (Or. 1984), and *State v. O'Key*, 899 P.2d 663 (Or. 1995), and that the AFTE firearms identification evidence was therefore inadmissible; noting the "subjective nature of the AFTE method, and the related fact that each practitioner has a different rate of error"; the prosecution "did not carry its burden of showing that the AFTE method is scientifically valid"); *United States v. Adams*, 444 F. Supp. 3d 1248, 1266 (D. Or. 2020) (refusing to find general acceptance of methodology because the broader scientific community "disavows the theory"; however, allowing the expert to testify to observational evidence made during his toolmark comparison); *Kimberley*, No. 22 C.R. 02932 01, at 57-59 (conducting a Rule-of-Evidence-403 hearing on admissibility of firearms examination evidence and determining that firearms identification testimony was subject to exclusion under the rule because the risk of prejudicing, confusing, or misleading the jury in the case before it substantially outweighed the probative value of the evidence; further determining that the identification did not

meet the foundational requirement for admissibility under Rule of Evidence 702; and acknowledging that it had rejected the defendant's request for a "Rule 702/*Frye* hearing because, citing *Rodriguez*, the general admissibility of firearms identification testimony is settled law in Illinois"). Defendant contends that, based on the foregoing, the type of testimony the State offered here was novel for *Frye* purposes and that trial counsel should have argued that firearms identification and comparison lacked general acceptance within its particular field.

¶ 138   We reject defendant's argument. Defendant relies on three foreign decisions and an Illinois trial court case. The fact there is a dearth of authority upon which he can rely cannot support an argument that, at this point, the admissibility of expert testimony pertaining to firearms and toolmark identification is unsettled. Indeed, stated differently, it hardly reflects that recent court decisions in any notable number are questioning the admissibility of this evidence. Further, in *Kimberley*, upon which defendant primarily relies, the court *rejected* the defendant's request for a *Frye* hearing and excluded the firearms evidence based on, as defendant acknowledges, Rule 403 issues specific to that case. *Rodriguez* and *Robinson* remain good law. Accordingly, trial counsel could not have rendered ineffective assistance for failing to request a *Frye* hearing.

¶ 139                                        2. Cross-Examination

¶ 140   Next, defendant argues that trial counsel failed to meaningfully challenge Parise over his methods and conclusions so as to alert the jury to the documented controversies in his field. A meaningful challenge, he asserts, could have educated the jury on the controversies and questions repeatedly raised about the reliability of firearms identification and comparison testimony.

¶ 141   The decision of whether and how to conduct a cross-examination of a witness is generally a matter of trial strategy and will not support a claim of ineffective assistance of counsel. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 62. "To prove otherwise, a party must show that counsel's

conduct was 'so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' " *People v. Petrie*, 2021 IL App (2d) 190213, ¶ 66 (quoting *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82). Decisions regarding the manner in which to cross-examine a particular witness involve the exercise of professional judgment, which is entitled to substantial deference. A defendant can only prevail on an ineffectiveness claim by showing counsel's approach to cross-examination was objectively unreasonable. *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997).

¶ 142    Here, on cross-examination, counsel elicited from Parise testimony about the components of a cartridge and semiautomatic firearms and what happens when the trigger is pulled. He testified that he was aware that the police had test-fired the Glock. Parise also noted that he packaged the expelled casings with the evidence after his test-fires. Significantly, counsel also elicited that Parise could not opine as to who fired the firearm.

¶ 143    We conclude that defendant's assertion that counsel should have questioned Parise about the reliability of firearms identification and comparison testimony is unavailing because, as we concluded above, that issue is settled. Thus, we cannot conclude that counsel's conduct in this respect was irrational or objectively unreasonable.

¶ 144    We also find unavailing defendant's reliance on *Petrie*, 2021 Il App (2d) 190213, where the defendant day care owner was charged with injuring the victim, a child in her care. Multiple experts testified as to the cause and circumstances of the injury (including whether it occurred while the child was at the day care or sometime before). On appeal, the defendant argued that trial counsel was ineffective for failing to sufficiently cross-examine the State's expert on the bases of his opinions (that the causal injury—shaking—must have occurred immediately before a seizure and that there would not have been a lucid interval). The question of timing, the defendant argued,

was pivotal in the case, and the only way to establish when the causal event occurred was through expert testimony. However, trial counsel did not ask the expert to identify a basis in the professional literature for his immediate-effect/no-lucid-interval opinion and did not inquire whether the general consensus of professionals supported that opinion. The reviewing court held that there was deficient performance, in part, because the expert's opinion was subject to objection as being inadmissible for lack of foundation and for failure to cross-examine him on the basis of his opinion. *Id.* ¶¶ 72, 75, 78. The court noted that the record was not clear as to the reason for the expert's opinion, he never testified that his opinion was the general consensus in his field of child abuse pediatrics, and he did not identify any professional literature supporting his opinion. *Id.* ¶ 72.

¶ 145   Here, defendant argues that by the time of trial in 2024, expert reports and case law existed that allowed trial counsel to familiarize himself with the controversies in the field of firearms identification and comparison testimony. However, like in *Petrie*, counsel failed to question Parise about the ongoing criticisms in the field, failed to inquire about error rates in the field, and failed to inquire about the criteria for identification that did not rely on subjective visual perceptions. Parise's opinion that the black firearm found in the apartment matched the firearm used to shoot Juarez (which Juarez stated was brown) went, he argues, wholly unchallenged by trial counsel.

¶ 146   We reject defendant's arguments. *Petrie*, unlike this case, involved competing experts, and the court's holding was based on the fact that the reason for the expert's opinion was unclear. *Id.* ¶ 72. In *People v. Robinson*, 2018 IL App (1st) 153319, a case with circumstances more like this case than *Petrie*, the defendant argued that a ballistics expert provided insufficient foundation for her conclusions linking shell casings found at the scene to particular firearms. She did not challenge the expert's qualifications to testify as an expert in ballistics identification or the general

admissibility of the evidence. Rather, the defendant challenged whether the expert sufficiently disclosed the reasons for her opinions to establish the reliability of the underlying information. The reviewing court held that the lack of detail in the expert's testimony went to its weight, not its admissibility, and trial counsel's "inability (or unwillingness) to put [the expert] through her paces does not make the foundation inadequate." *Id.* ¶ 19 (citing *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 125 (firearms expert who testified about class and individual characteristics of bullets, without specifying which individual characteristics matched particular bullets, laid sufficient foundation; inadequacies affected weight of opinion, not admissibility)). We come to the same conclusion. Parise testified about his education and 30-year professional background, that he has testified about 130 times as an expert (for both the prosecution and the defense), and he addressed his training and certifications. And, again, the issue of the reliability of firearms identification and comparison testimony is settled. Accordingly, we reject defendant's argument that trial counsel performed deficiently by not sufficiently cross-examining Parise on the bases of his opinions and his methodology.

¶ 147   In sum, we reject defendant's argument that trial counsel was ineffective for failing to challenge the firearms identification testimony.

¶ 148                              E. Cumulative Error

¶ 149   Defendant's final argument is counsel's errors cumulatively prejudiced him and rendered the verdict unworthy of confidence. He notes the *Zehr* issue, the circumstantial evidence at trial, counsel's failure to challenge Parise's testimony, and counsel's closing argument. Defendant requests that we reverse the convictions and remand for a new trial.

¶ 150   Whether a defendant received a fair trial and due process of law are questions subject to *de novo* review. *People v. Radcliff*, 2011 IL App (1st) 091400, ¶ 22.

¶ 151 We reject defendant's argument. Because we have assumed that, at best, there was only one error as to the claims defendant raises on appeal, there was no cumulative error. *People v. Quezada*, 2024 IL 128805, ¶ 46 ("cumulative error can occur only when there is more than one error").

¶ 152 III. CONCLUSION

¶ 153 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 154 Affirmed.